## Case No. 15,551.

### UNITED STATES v. The LA JEUNE EUGENIE.

[2 Mason, 409.] [1]

Circuit Court, D. Massachusetts. May Term, 1822.

SLAVE TRADE—FORFEITURE OF VESSEL—INTERNATIONAL AND MUNICIPAL LAW—ADMIRALTY JURISDICTION AND PRACTICE—RIGHT OF SEIZURE AND SEARCH.

1. If a foreign claimant of a vessel seized for being engaged in the slave trade, sets up a title derived from American owners, he must give affirmative evidence, that the case has no admixture of American property.

2. Whenever property is brought into a court of admiralty for adjudication, upon a seizure for a forfeiture, or other cause cognizable there, the property is, in contemplation of law, in the custody of the court, and cannot be withdrawn from its possession but by some person, who shall establish a title to receive it.

[Cited in Hooper v. Fifty-One Casks of Brandy, Case No. 6,674; Church v. Seventeen Hundred Dollars, Id. 2,713; Averill v. Smith, 17 Wall. (84 U. S.) 93.]

3. A right of seizure may exist on the high seas independently of any right of search.

[Cited in The Springbok, Case No. 13,262.]

4. The lawfulness or unlawfulness of the mode by which evidence is obtained, does not affect its admissibility in a court of law.

[Cited in U. S. v. Hughes, Case No. 15,419.]

5. The African slave trade, abstractly considered, is inconsistent with the law of nations; and a claim founded upon it, may be repelled in any court, where it is asserted, unless the trade be legalized by the nation to which the claimant belongs.

[Cited in Tufts v. Tufts, Case No. 14,232.]

[6. Any trade contrary to the general law of nations, although not tending to, or accompanied with, any infraction of the belligerent rights of

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by William P. Mason, Esq.]

that country whose tribunals are called to consider it, may subject the vessel employed in that trade to confiscation; and it matters not in what stage of the employment, whether in the inception or the prosecution or the consummation of it, the vessel is arrested.]

[Cited in Wheaton v. Peters. 8 Pet. (33 U. S.) 691; The Malaga, Case No. 8,985.]

[7. A vessel engaged in the slave trade, and sailing under French colors and with French papers, was seized by an American cruiser on suspicion of being of American ownership. It appeared, however. that she was in fact a French vessel. *Held*, that she was subject to condemnation both by the law of nations and the municipal law of France, and she therefore should not be delivered to the claimants. who had used her in the illegal traffic; that, as she was not an American vessel, the officers and crew of the seizing cruiser had no interest in her; and that the court would order her to be delivered to the French consular agent, to be by him turned over to his government.]

[Distinguished in Gedney v. L'Amistad. Case No. 5,294a. Cited in Albury v. The Byron, Id. 2,275.]

This was a libel against the schooner La Jeune Eugenie [Raibaud and Labatut, claimants] for being engaged in the slave trade. By an act passed by the congress of the United States on the 2d of March, 1807, the importation of slaves into any port of the United States was prohibited after the 1st of June. 1808; the time limited by the constitution of the United States, beyond which slaves could not be imported. By this act the president was also authorized to employ armed vessels to cruise on any part of the coast, where he might judge attempts would be made to violate the act, and to instruct the commanders of armed vessels to seize, and to bring in, vessels found on the high seas contravening the provisions of the law. Previous acts had been passed to prevent the citizens of the United States, or any resident within the United States, from being engaged in the transportation of slaves from Africa, or elsewhere, to any foreign port. By an act passed on the 20th of April, 1818 [3 Stat. 450], in addition to the above, it is provided among other things, that in all prosecutions under this act the defendant shall be holden to prove that the negro, &c. which he shall be charged with having brought into the United States. or with purchasing, holding, selling, &c. was brought into the United States at least five years previous to the prosecution, or was not brought in, holden, purchased, or otherwise disposed of, contrary to the provisions of this act. By an act passed on the 3d of March, 1819 [3 Stat. 532], the power of employing the armed ships of the United States to seize and bring into port any vessel, engaged in the slave trade by citizens or residents of the United States. was continued in the president. And by this act such vessels, together with the goods and effects on board. are to be forfeited and sold, and the proceeds to be distributed in like manner, as is provided by law for the distribution of prizes taken from an enemy. and the of-

ficers and crew to undergo the punishment inflicted by previous acts. On the 15th of May, 1820 [3 Stat. 600], it was further enacted, that if any citizen of the United States, being of the crew or ship's company of any foreign ship or vessel, engaged in the slave trade, or any person whatever, being of the crew or ship's company of any ship or vessel owned in the whole, or in part, or navigated for, or in behalf of, any citizen or citizens of the United States, shall land from any such ship or vessel, and on any foreign shore, seize any negro or mulatto, not held to service or labor by the laws of either of the states or territories of the United States, with intent to make such negro or mulatto a slave, or shall decoy or forcibly bring, or carry, or shall receive, such negro or mulatto on board any such ship or vessel with intent as aforesaid, such citizen or person shall be adjudged a pirate, and on conviction shall suffer death.

Under the authority of these acts, and for the purpose of more effectually enforcing the provisions of them, the public armed schooner Alligator, commanded by Robert F. Stockton, Esq. was sent among other vessels to cruise on the coast of Africa early in the year 1821. On the 17th of May last. Captain Stockton fell in with the schooner La Jeune Eugenie at Galenas near Cape Mount, on the western coast of Africa, and captured her on the suspicion of her being engaged in the slave trade; she at that time bearing the French flag, and having French papers. She was brought, under the charge of a prize master, into the port of Boston, and libelled at the September term of the district court next following, as an American vessel engaged in the slave trade. All the regular ship's papers, and other documents relating to the cargo were found on board of her. And it appeared from her register that she was owned by Messrs. Raibaud and Labatut, residents at Basseterre in Guadaloupe, but was built in the United States. It also appeared in evidence that she was fitted out at Basseterre in the month of February next preceding her capture; sailed from thence, sometime in the same month to St. Thomas, and from thence to the coast of Africa, with the ostensible purpose of procuring palm oil and other products of Africa. Wm. W. M'Kean, a midshipman on board of the Alligator, and the prize master, who brought the Eugenie into the port of Boston. deposed that the Eugenie had a moveable deck, that her main hatchway was very large, and grated with three iron bars, that the water on board was sufficient to supply two hundred men for a month; and her provisions, including rice, enough for her crew for a twelve-month. Joseph Dickson, a seaman belonging to the Alligator, deposed, that the Eugenie had a crew of nineteen persons including boys; some of them Spaniards and some Italians, that she had a large supply of provisions, sufficient for her crew for

five months, and a number of handcuffs and fetters. It was also in evidence that there was a surgeon attached to the vessel, and a supply of medicines on board. Henry Henderson, a seaman belonging to another vessel on the coast, which was also captured by the Alligator, deposed, that he was on shore at a place called the "Factory" four and a half days, in company with the captain of the Eugenie. And that he understood that the Eugenie was then after a cargo of slaves. That the captain had then procured twenty or more, and said that he should have all the slaves ready in twenty days; and Henderson further deposed, that he was told by the owner of the Factory, that the captain of the Eugenie was to have 250 or 300 slaves; and that he also heard the king's son say the same thing. All the seamen belonging to the crew of the Eugenie, who were examined, deposed, that they had no reasons whatever to suppose that the vessel was engaged in the slave trade. A claim was entered by the Chevalier de Valnais, the French consul, on behalf of the owners of the Eugenie, and also a protest against the seizure and judicial proceedings, on behalf of the French government. A claim for restoration of the vessel and damages for her seizure and detention was also made by M. Alleye de Billon, the attorney and agent of the owners, Messrs. Raibaud and Labatut. A pro forma decree in favor of the claimants was rendered in the district court, and the case brought up by appeal to the circuit court at the last October term.

The libel contains two counts. The first alleged, that the Eugenie was, at the time of the seizure, a vessel of the United States, seized for a contravention of the acts of the United States prohibiting the slave trade. The second alleged, that the Eugenie was captured as prize, and at the time of the seizure was concerned and employed in the slave trade, without alleging to what nation she belonged.

Messrs. Blake and Webster, on behalf of the United States and of the captors, contended: (1) That the Eugenie was a vessel of the United States. It appeared from the register, that she was built in the United States, and no evidence being offered to shew, that she had been transferred to French citizens before the passage of the law of the 20th of April, 1818, it was not to be presumed, that she was so transferred until after that time. That the assumption of the French flag, and of French papers, for the purpose of evading the laws of the United States had now become so common, that the courts of the United States would not rest satisfied with such evidence, alone, of French ownership. That the act of the 20th of April, 1818, which threw the burden of proof on the defendant to shew, that he had not broken the laws of the United States, applied as well to this case, as to that of the importation of slaves into the United States. And

it therefore became necessary for the claimants to show a bona fide transfer of the Eugenie to French subjects, which could only be done by producing the bill of sale. (2) That it fully appeared from the evidence in the case, that this vessel was actually engaged in the slave trade. (3) That if the court should be of opinion, that the vessel was bona fide French property, still, as it necessarily appeared to the court from the investigation of the case, that she was engaged in the slave trade, the court would take notice of the French ordinances against that traffic, and the ship being rightfully in the possession of the court, it would refuse to deliver it up to the claimants, who were precluded from asserting property therein, as well by the law of their own country, as by that of this country. (4) It was contended, that the slave trade was contrary to the law of nations, as at present understood and received; and that this court might rightfully condemn the Eugenie for an infraction of that law. It was urged, that the slave trade was contrary to the law of nations, because it was a violation of the law of nature, which constituted a component part of the law of nations. It was not denied, that slavery might under some circumstances have a legal existence: and therefore a trade in slaves might be under these circumstances legal. But that this traffic preyed upon the innocent and the free to make them slaves for no crime or offence. That it was merely a barbarous, unauthorized, private, piratical warfare, carried on against Africans to make them slaves. That it was contrary to the law of nature, because it instigated and encouraged the most atrocious crimes and barbarities, and presented an insurmountable barrier to the advancement of civilization and virtue in that country, which was its theatre. It was further contended, that most or all the civilized nations of the globe, had declared their sense of the illegality of this trade, by enacting laws to suppress it, and by various other public acts, treaties, and declarations. And that it might now therefore be considered as contrary to the conventional law of nations. And to support this ground the various laws and ordinances of different governments on this subject were adverted to, and commented on, as also the various treaties between nations, and their public declarations and diplomatic correspondence. It was finally contended, that this point had been already judicially decided; and the case of The Fortuna, 1 Dod. 81; The Amedie, Id. 84, note; The Donna Marianna, Id. 91; The Diana, Id. 95; and the case of The Plattsburg, decided by Judge Van Ness in the district of New York [unreported], were here cited.

The counsel confined their argument solely to the claim of Messrs. Raibaud and Labatut; and admitted, that a different question might arise in the case, if any claim should be presented in the name, or on behalf of the French government.

Wm. Sullivan, for claimants (having made several objections to the form of the libel, and among others, that it was a process on the instance side of the court, but in the nature of prize, and at a time, when no belligerent rights could come in question; that the evidence of the persons found on board had been taken according to the form of prize proceedings, and without notice to any adverse claimants; that the evidence, thus irregularly introduced, did not, and that no other evidence in the case did prove La Jeune Eugenie to have been employed in the slave trade; that the construction of the vessel was consistent with the mercantile employment alleged by the claimants; that the casks on board were intended for the reception of palm oil, which was the principal object of the voyage; that the number of men was not more than is usual in the French mercantile service; that there were no irons, no boilers, no preparations usually found, and said to be necessary, in vessels intended for transportation of slaves; that the alleged employment of the vessel was absolutely negatived by the persons, who had been found in her; and that the employment asserted by the claimants had been established by every one of those witnesses; that the proper form of process would have been to set forth an offence against some law of the United States; and that it should contain all such facts, and allegations, as would show a case to have arisen, of which this court can take cognizance; and that the evidence should have been presented according to the forms in use, where a crime is alleged to have been committed, or a forfeiture to have been incurred), contended that this vessel not being American, was not subject to the jurisdiction of this court, unless the libellants were right in assuming, that the African slave trade was prohibited by the law of nations; and to show, that no such prohibition existed, the claimants' counsel assumed: (1) That there is no other principle, to which to refer national law in a court having jurisdiction of the law of nations, than the assent of nations; and that such assent can be known only by custom or usage. (2) That as to slavery generally, or the African slave trade in particular, nations have expressed no opinion, no assent, which can be noticed in a national court.

The counsel for the claimants, after illustrating these points by a course of argument derived from historical events, proceeded: There are no principles applicable to this case, which are not sanctioned by all jurists, and by practice and custom universally admitted. Those on which the case must be decided, are no where better expressed, nor so well, as by Sir W. Scott: "One fundamental principle of public law is the perfect and entire equality of nations; and it mainly concerns the peace of mankind, in their private and politic capacities, to preserve this principle inviolate."

The second is, "that all nations have an equal right to the uninterrupted use of the ocean. In places where no local authority exists, where the subjects of all states meet upon the footing of entire equality, and independence, no one state, or any of its subjects, has a right to assume, or to exercise, authority over the subjects of another." The present chief justice of the United States, while a member of congress, had occasion to consider some principles applicable to this case. "The jurisdiction of a nation extends to the whole of its territory, and to its own citizens in every part of the world." He quotes Rutherford: "The jurisdiction, which a civil society has over the persons of its members, affects them immediately, whether they are within its territories or not." 2 Ruth. Inst. p. 180. "On the sea itself no nation has any jurisdiction; all may equally exercise their rights." "No nation has any jurisdiction at sea, but over its own citizens, or vessels, or offences against itself." He cites to this point 2 Ruth. Inst. 488–491. "The right of any nation to punish is limited, in its nature, to offences against the nation inflicting the punishment; this principle is believed to be universally true." Piracy "under the law of nations, which alone is punishable by all nations, can only consist in an act, which is an offence against all. No particular nation can increase, or diminish, the list of offences, thus punishable." Principles no less fundamental, and asserted by all writers, and sanctioned by universal assent, are the sovereignty of each state within its own territories. And that each nation may regulate every interior interest without giving offence, and without accountability to any other nation. The form of government, and mode of administration; religion and mode of worship; what shall be deemed to be property, and what shall not be; the mode of acquisition, possession, and alienation; what acts shall be deemed crimes, and what forfeitures shall ensue, are all subjects which each nation reserves to itself.

The argument on the part of the libellants proceeds on some, or all of these grounds. (1) The law of nations is founded on the principles of justice and humanity. This law must forbid slavery, because slavery is inhuman and unjust. (2) The law of nations, if it does not forbid slavery, universally, forbids the African slave trade; because, that trade is unjust, inhuman, and barbarous. (3) The municipal prohibitory laws of our own nation and of the nations of Europe, the recent negotiations in Europe, and the treaties, which have followed them, are evidence that the slave trade is illegal by the law of nations. It is insisted, that the slave trade has been wrong for six hundred years; that it ought now to be broken up, and by judicial sentence. If slavery is illegal by the law of nations, that fact will appear by the usage and customs

of nations. If it does not appear from custom and usage, to be so, nothing but international treaties will show it to be so. At this day there is no one point concerning slaves, which is international, unless it has been made so by treaty. As to the possession of slaves, as a mere matter of property, within the territorial limits of different nations, such possession, and use of human beings, was never connected with any question of national law until this discussion occurred. When moralists and jurists, whose works are held to be authorities on natural or national law, have spoken of slavery, the strongest expression that any of them have used, is the mere assertion, that no man is by nature a slave. If this be so, and there were custom to the contrary, it is an assertion, which applies to men individually, and to the states of which they are members; it is not a principle, addressed to communities, or states, collectively. If it be one of those just and moral precepts and injunctions, which are discoverable by the light of reason, that no man may make his fellow-being his slave, it is one of those precepts, or injunctions, which every man, and every community, have interpreted and applied for themselves. Whatever the precept may be, by whomsoever, and wheresoever pronounced, it has always encountered the fact, that mankind have always been divided into masters and slaves. Whatever changes the world and society have undergone in other respects, thus far it has undergone none in this; excepting in some few communities, where slavery has ceased. This lamented Africa, to which we are now called upon to make retribution on claims, which have been accumulating for ages, if she was the first, in time, in arts, in science, and refinement (which may well be doubted), was also the first to show the division of mankind into master and slave. The monuments of northern Africa, which have survived all history and tradition, prove nothing so distinctly as their own antiquity, and that they were raised by the toil of slaves. The same distinction is found among Jews and Gentiles; among Greeks, and barbarians; among Romans, and strangers.

Slavery ceased in Europe towards the middle of the thirteenth century; but from what operative causes, it is not necessary to examine; most probably partly from the influences of Christianity, and partly from political necessity. But unquestionably not from any new discovery, that slavery was forbidden by any law, human or divine. If there had been any such positive prohibition by any law, by whatever name it may be distinguished, this law would have appeared, and would have been found in practice, at some time before the beginning of the fourteenth century. Modern slavery began on Portuguese capital, protected, and encouraged by royal authority. In England, now so distinguished in the abolition, no question of the legality of holding slaves appears to have been raised; but every possible proof is found, that it was considered as on the same footing as any other commerce. Between the years 1618 and 1672, there were no less than four chartered companies to deal in slaves; the last of which was dignified with the name of the Royal African Company, and had among its subscribers the king of England, his royal brother, and many persons of high rank and quality, and was founded on a capital of £110,000, a prodigious capital for that time. From 1688, till the period of abolition, the trade has been free and open to all British subjects. As lately as 1750 an act was passed by the English parliament, for extending, and improving the trade to Africa. In Spain, the slave trade began as early as the year 1500. In 1517, the Emperor Charles V. granted a patent to supply 4,000 negroes annually; and the carrying of negroes soon became a branch of regular and established commerce. The concurrence of the emperor was obtained by that distinguished prelate Las Casas. His motive is stated to have been that the Indians, born free, and who were reduced to servitude by conquest, were incapable of the toils which were exacted of them; while the negroes, who were imported, were inured to servitude and drudgery, and would experience no unfavorable alteration of circumstances by a change of masters. Don Onis, the Spanish ambassador, says, in his letter to Mr. Adams, secretary of state (14 May, 1818): "The introduction of negro slaves into America was one of the earliest measures adopted for the improvement and prosperity of those vast dominions. This is not to be considered as having originated slavery, but as materially alleviating the evils of that, which already existed, in consequence of the barbarous practice of the Africans upon saving the lives of a considerable portion of the captives in war, whom they formerly put to death. By the introduction of this system, the negroes, far from suffering additional evils, or being subjected while in a state of slavery to a more painful life than when possessed of freedom in their own country, obtained the inestimable advantage of a knowledge of the true God, and of all the benefits attendant on civilization." In France, the peopling of their colonies with Africans appears to have attracted notice soon after the traffic was discovered. The views taken by the French government of this branch of commerce indicate no intention to break any law in pursuing it; nor any intimation, that any man, however philosophical, moral, or wise, had at that time, nor at any time since, discovered that national law stood in the way of the African traffic, nor any principle of any law, in opposition to the right of property in slaves.

Valin, in his Commentaries (volume 1, p. 411), says: "Par rapport, a ces negres esclaves, dont la multiplication est la source feconde

des richesses des nos colonies, le gouvernement a toujours été également attentif à soutenir et protéger le commerce de Guinée, où se fait le traite de ces negres, à régler leur état, et leur discipline aux colonies, et a ne permettre leur introduction dans le Royaume, qu'avec précautions capables d'empêcher, que les colonies ne fussent privées de leur secours." In the 12th article of the ordonnance of 1738, it is enjoined on slave owners to take care, that slaves should be brought up, and instructed, in the principles, and in the exercise of the Roman Catholic and apostolic religion. In the United States, the introduction of slaves into the colonies of North America was a natural consequence of the traffic. They were introduced and held as property without any moral shock; and time and circumstances have, at this day, circumscribed their existence to the latitudes in our territory, within which, it is said, the white man cannot labour. There is nothing to remark on slavery in the United States, but the fact, that in all, and every instance, in which the blacks have been considered, spoken of, or referred to, it has been as property, subject to all the general and particular provisions, which the respective states saw fit to make concerning it. When the national compact was formed, slaves were no otherwise noticed, than to confer on the holders of them certain political privileges and immunities;—and to limit the power of prohibiting importation to a definite time. It is obvious, that the power over slaves was referred to the authority which congress had, to regulate commerce. How much of the apprehension, that this commerce would be prohibited, was referable to political jealousy, and how much to humanity, it is now unimportant to inquire, since all are willing to ascribe the prohibition to the best of motives. The last view, which this nation has taken on the subject of the right to hold black men as slaves, is found in that memorable and long continued effort of reason and eloquence, which terminated in opening a market for slaves throughout that immense territory, which is bounded east by the Mississippi, and north by the 36th degree of latitude, and west by what the United States may choose for a boundary. Perhaps the land march of a native black man of the United States, over hundreds of miles, securely bound to his fellow travellers, and they to him, and repeating his painful steps under the excitement of a driver's whip, does not present so shocking a spectacle, as is found in the hold of an African slave ship.

I have endeavored to show that slavery is unknown to the laws of nations in any manner, since slavery was a consequence of captivity in war; that no moralist, or jurist, who has given any opinion on slavery, has connected this subject with national law; that all nations have uniformly considered slaves as property, and consequently governed by municipal, or civil laws;—and especially are they so considered in each of the United States respectively, in which slavery is tolerated, and so admitted to be by the government of the United States. It is perfectly consistent with reason, common sense, the principles, on which national law rests, and with the practice of all nations, that neither the acquisition, the manner of holding, using, abusing, transferring, or transporting slaves, is either forbidden, commanded, permitted, or recognized by the law of nations. Why should the law of nations be applied to this subject of property, any more than to any other? How does it affect the safety, welfare, industry, rights, or happiness, of any individual of one nation, that the members of another nation, buy or sell on the coast of Africa, or elsewhere, black men to be held in slavery? How does it affect the military, or naval power; the resources, the commerce, the rights, the honour, dignity or glory of one sovereignty, that the subjects of another should commit immoralities and crimes, however shocking, within their own territories, or where no one nation has an exclusive jurisdiction, and every nation a jurisdiction, over its own subjects, only? It is clear, that slavery itself, according to the universal practice of all nations, is forbidden by no law. The place, in which they are first acquired, and the manner of transporting them, are merely circumstances connected with the possession of property, which men have agreed to hold as such. By the law of interior Africa, slavery is lawful. It is so, and ever was so, as far as practice and usage prove what the law is. Frenchmen, Englishmen, Dutchmen, Spaniards, Swedes, Danes, and Americans, may own slaves in their own territories. What is it, that the law of nations is supposed to step in, and forbid? It is the transportation over the Atlantic;—that is, a circumstance connected with the ownership of a particular species of property. All cruelty, inhumanity, barbarity and oppression, are forbidden by the law of nature, everywhere. But how are the abominable acts of the slave traffic distinguishable by the law of nations, from the cruelties, which a planter on a West-India island, or a planter in a southern state, or a negro driver employed to stock the new territories, may commit? Whatever the law of nature, and of conscience, may say, the law of nations is silent.

There are certain things, which are essential to every law: (1) A law must be possible. (2) It must be of some utility. (3) It must be just;—that is, conformable to the order and nature of things, and the constitution of man. (4) It must be sufficiently known. (5) It must be attended with proper sanctions. A law against the slave trade must be possible, useful, and just. If nations have made such a law, or have adopted the provision of the law of nature to this effect, how is it known as a law? When and

where have nations promulgated this law? By their precepts, or by their practice? If they have promulgated such law, under what sanction, or penalty have they done this? Have they agreed to a forfeiture of property, or to any punishment, which each and every nation may impose and inflict? When and where have they done this? If they have made a law, but have annexed no sanction, or penalty, to the breach, is it any thing more than mere recommendation, prudent counsel, which may be taken, or rejected without offence? Thus the matter of slavery stood, and continues to stand, so far only excepted, as has been affected by the positive laws of respected sovereignties, and the diplomatic intercourse at Vienna and Aix-la-Chapelle, within the last six years, and by the consequences of this intercourse.

(The counsel for the claimants here went on to remark upon the measures taken in England to effect the abolition of slavery, and on the negotiations by the sovereigns of Europe.)

It is now urged upon the court, that because the sovereigns of Europe happened to meet, and to converse, upon a great moral evil, and came to the conclusion, that it ought, in some way, and at some time, and as soon as the habits and prejudices of their respective subjects, would permit, to be done away; and that to this end, when they went home, they would restrain their respective subjects accordingly, the law of nations is changed. A new chapter has been struck off, and is the law to this court, and to this nation, who had no part in the conference. Suppose that the ministers at Vienna and Aix-la-Chapelle had taken into consideration the frequency, and enormity of the plunderings and murders, practised upon travellers, who were lawfully employed in traversing Europe, and the facility, which felons found, of escaping by crossing territorial lines; and the conference had produced new laws, and higher penalties in each state;—would robbery have, therefore, been made a crime punishable by the law of nations? Suppose that the conferees had considered, whether it would be expedient to agree by convention, and positive contract, that a robbery, committed in one sovereignty, might be punished in another, if the felon were found there; and they had, una voce, declared, that they never would, or could, surrender the right of administering their own laws in relation to their own subjects; would robbery, nevertheless, be made a crime by the law of nations? Lord Castlereagh is of opinion, and has attempted to convince the proper functionaries of all the states in Christendom, that mutual search and seizure are yet wanting in the remedial process. Of that opinion has been no nation, but his own. The Netherlands, Portugal, and England are trying an experiment, limited exclusively to cases, where slaves are found on board:—no other nations have agreed to this. Our own, and

France, have positively refused all accordance in such measure. And both France and the United States have again and again most emphatically refused to permit their vessels to be visited and searched for slaves, or for any other purpose, in time of peace. (See the report of the committee of the house of representatives in congress on the slave trade, Feb. 9, 1821.)

If the law of nations is silent on the subject of slavery, as found in jurists, and as found in practice and custom among sovereigns; if no treaty, which this court can notice, has prescribed any rule on this subject; if the vessel in question was French, and even if she has offended only against the law of France, yet the learned advocates insist, that this court has jurisdiction, and may refuse restoration to the claimants, may refuse to condemn, and may withhold the property, until some better title appears; that the claimant is an actor, or plaintiff, and must prove his case, and show himself innocent of all offence, against any law, but certainly against the law of his own country. These are new and extraordinary doctrines. Admitting, for the present argument, that this court has the most unqualified power, that can be exercised by any court of the law of nations, by any court of admiralty and maritime jurisdiction; still it has no jurisdiction over this vessel, let her have done what she may. The only possible reason, on which the decision in the cases of the Amedie and the Fortuna could have rested, was, that the courts, in which those cases occurred, had a lawful jurisdiction as prize courts; and having it, the lords of appeals saw fit to notice, as a court administering the law of nations, their own municipal law, and that of this country. If the Jeune Eugenie had been brought in here by a belligerent cruizer, and this court were trying questions on the law of prize of war, these cases would require more consideration. But the case of the Eugenie is the same, in all respects, as though she had been lying in a port of France, and had been cut out thence by the Alligator, on suspicion that she was American, and liable to seizure for some offence committed against the United States.

The case of Le Louis [2 Dod. 210], before Sir W. Scott, was here commented on, as decisively settling, that the slave trade is not prohibited by the law of nations. In Madrazo v. Willes, 3 Barn. & Ald. 353 (in 1820), Mr. Justice Bailey says—"Although the language used by the legislature in the statute referred to is very strong, yet it can only apply to British subjects, and can only render the slave trade unlawful, if carried on by them. It cannot apply in any way to a foreigner. It is true, that if this were a trade contrary to the law of nations, a foreigner could not maintain this action; but it is not: and as a Spaniard cannot be considered as bound by the acts of the legislature prohibiting this trade, it would be un-

just to deprive him of a remedy for the wrong which he has sustained." Mr. Justice Best says—"It is impossible to say, that the slave trade is contrary to what may be called the common law of nations."

In presenting the claimant's view of this case, a justification of slavery, or the slave trade, is not intended. I concur entirely in the views of the libellant's counsel on these subjects; and readily acknowledge, that at no time, nor on any occasion, have the noble and honorable sentiments, which spring up in cultivated minds, been more eloquently and ably impressed, than in this case. As to slavery, generally, it is a subject to be touched with some tenderness in this country. In our Northern clime, we do not want, and cannot use slaves. Slavery would have ceased among us without the aid of positive law. The character of our industry, and our sentiments on civil rights, apart from all moral and religious objection, would, long since, have rendered such servitude among us odious and intolerable. It is far otherwise in the South. Among the best informed and most virtuous men, perceptions of moral truths often take their character from wants and necessities. A white person, born and educated in a community, where the distinction between master and slave has endured through successive generations for centuries, would hardly discover by the light of reason, that slavery, by which he gets his wealth, comforts, and daily bread, is forbidden by the law of God, while he finds so many human laws to the contrary. He would be startled to hear, that the holding of negroes in servitude is a foul stain on the moral character of his country. Philosophical reasoning is a feeble arm against those, who defend rights of property, which have been long continued, and frequently, and solemnly admitted. However we may deplore such a state of society, who has been able even to suggest a remedy? Let any man, the most enlightened and humane, apply himself to the study of slavery, and the means of ending it, and he will find, that rights and duties and conflicting necessities have cast him on an ocean, where he can take no observation by day, and where no beacon will cheer him, when the day is gone. The voluntary extension of slavery, through vast, and unpeopled regions, is a far different subject. And widely different from either is the African traffic.

Without stopping to inquire what nature has given, or denied to the black man; or whether nature intended him for the white man's equal or the white man's slave (see "Notes on Virginia"), it is the highest honor of the age, that all Christian states have severally admitted the slave trade, to be a sin of deepest dye. It includes, and is the collective name for all the crimes, which moralists and lawgivers have declared to be, severally, punishable with death. In this dreadful sin, the Christian rulers of the earth may not hold themselves guiltless, since all who

can prevent, and who do not, are justly said to command, the offence. It were far better for the honor of humanity, and for the condition of Africa, that abolition should not have been attempted, than to leave it, where it is. To what immediate cause are we to refer the increased, and increasing horrors of the traffic? Why is it that "human beings are concealed in casks—and sometimes thrown into the sea?" Why is it that the narrow space of a small swift-sailing vessel is filled with living men, women and children; shut up, where it is agony to breath;—where the living, the dying, and the dead, are found in the same fetters; and where the past, the present, and the future must alternately distract attention? It is the inefficient attempt at abolition, which is chargeable with these enormities. No half-way measure can be justified. Nations, having begun, are bound in honour and conscience to go on. It is their solemn duty to declare the slave trade an offence against all, and punishable by all; and to agree among themselves, that slave dealers on the ocean are hostes humani generis. But even this is not enough;—the means should be found of detecting, and punishing those, who stay at home, but who furnish the capital for the traffic, and who are far more guilty, than the brutal agents, whom they employ. Such laws, such conventions, and the aid of fleets, are alone competent to effect the abolition. Surely it cannot be the way to suppress this traffic, to ask from a judicial tribunal an act of legislation; and to presume the assent and concurrence of all other nations, against the express and positive dissent of every one of them. It may do for zealous and humane advocates, in the fervour of their feelings, to found their arguments on the maxim, aut viam inveniam, aut faciam, but they cannot expect of any court of the law of nations to found its judgment thereon.

In deciding on new and unprecedented cases, some consideration is due to expediency and convenience. At least such has been the practice in the British court of admiralty. By the judgment which the libellants desire to have given, in the present state of the world, the progress of assent to effect abolition may be seriously retarded. The apprehensions of those cabinets, which have resisted Lord Castlereagh's importunities, may be greatly strengthened. Visitation and search will be legitimated; these will be followed by resistance, conflict and blood; by inflamed and exaggerated accounts of both parties; and then, something of an old grudge, or an appetite for a new one, or nothing more than the feverish inquietude of peace, may bring the lamented wars of interior Africa to the Atlantic, and to the shores of all civilized nations. There are some high men in Europe, who do not like our political example; nor the economy and simplicity of our government: nor our interior industry and ingenuity; nor our external enterprise and com-

merce; nor the gradual extension of our limits; nor the sound of our cannon. There are many, who think it would do the old world no evil, to clip effectually the pinions of the new; and all of them know, that a wrong done by a public officer is a wrong done by a nation, until disavowed. But in this court, neither of the counsel can believe, that judgment ever was, or ever will be, rendered according to hopes and wishes; nor according to apprehensions of remote, or possible consequences. The law must rule here, whatever may be private opinion. If in replying, any thing has been offered for the claimants, which does not deserve the notice of the court, it will, of course be disregarded. But, on the other hand, I cannot but consider no small portion of what has been urged for the libellants, as mere embellishment of reasoning;—rhetorical fragrance, which ascends to the bench of justice, to refresh and delight, but which, in obedience to the law of its nature, will escape and pass away; while that only, which is solid and tangible, will remain, among the materials of that judgment, which our own nation, and perhaps the community of nations, will regard with no common interest.

STORY, Circuit Justice. This is a libel brought against the schooner La Jeune Eugenie, which was seized by Lieut. Stockton, on the coast of Africa, for being employed in the slave trade. The allegation asserts the offence in two forms: first, as against the slave trade acts of the United States; and, secondly, as against the general law of nations. A claim has been given in by the French consul, in behalf of the claimants, who are subjects of France, resident in Basseterre, in the island of Guadaloupe, as owners of the schooner; and there is also a protest filed by the French consul against the jurisdiction of the court, upon the ground, that this is a French vessel, owned by French subjects, and, as such, exclusively liable to the jurisdiction of the French tribunals, if she shall turn out, upon the evidence, to have been engaged in this dishonourable traffic.

I am fully aware of the importance and difficulty of this case, considered under some of the aspects, in which it has been presented to the court. The case has already, as we are informed, and truly, become the subject of diplomatic intercourse between our government and that of France; and it is not, perhaps, too much magnifying its grave character to declare, that rarely can a case come before a court of justice more deeply interesting to the cause of general justice and humanity, or more likely to excite the jealousies of a foreign government, zealous to assert its own rights, and, it is to be hoped, not, in the slightest degree, reluctant to fulfil its own plighted faith for the abolition of the African slave trade. Whatever may be my

own distress in being called upon to attend to such weighty considerations, and whatever my solicitude rightly to discharge my duty to my own country, to France, and to the world, on the present occasion, it cannot escape the attention of any persons, who hear me, that a court of justice in this country has its path clearly marked out and defined. However delicate or painful may be its predicament, it cannot seek shelter under the wings of executive authority, or bind up its judgment under considerations of mere convenience or comity, or a blind obedience to the wishes of any sovereign, or a desire to extinguish, what it must justly deem, a trade abhorrent to the great principles of Christian morality, mercy, and humanity. It is bound to administer the law, as it finds it, fearlessly and faithfully, according to the dictates of its own judgment, in the hope at least, that errors of law may be corrected by a higher tribunal, and national difficulties may be removed by those, who hold the legislative and executive authorities of the nation.

It appears from the evidence in the case, that this vessel is duly documented as a French vessel, and that she sailed on a voyage from Basseterre for the coast of Africa, and was found upon that coast by Lieut. Stockton, under circumstances, which left no doubt on his mind that she was engaged in the slave trade. The master and some of the principal officers were on shore engaged, as it should seem, in collecting slaves at one of the factories established for this purpose. The vessel was equipped in the manner, that is usual for the slave trade. She had two guns, a false or movable deck, and a large quantity of water and provisions, and water casks, quite unusual in ordinary voyages, and indispensable in this particular class of voyages. If there are any persons, who entertain doubts as to the real destination and employment of this vessel, I profess myself not willing to be included in that number. Upon the evidence in the case it is irresistibly established to my mind, that the sole purpose of the voyage was a traffic in slaves; and that the intention was to carry them from Africa to some one of the French colonies, and, in all probability, to the port, in which the enterprise originated. In respect to the ownership, it has been already stated, that the vessel was sailing under the customary documents of France, as a French vessel; and certainly in ordinary cases these would furnish prima facie a sufficient proof that the vessel was really owned by the persons, whose names appear upon the papers. In ordinary times, and under ordinary circumstances, when disguises are not necessary or important to cloak an illegal enterprise, or conceal a real ownership, the ship's papers are admitted to import, if not an absolute verity, at least such proof, as throws it upon persons, asserting a right in con-

tradiction to them, to make out a clear title establishing their falsity. But if the trade is such, that disguises and frauds are common; if it can be carried on only under certain flags with safety or success; it is certainly true, that the mere fact of regular ship's papers cannot be deemed entirely satisfactory to any court accustomed to know, how easily they are procured by fraud and imposition upon public officers, and how eagerly they are sought by those, whose cupidity for wealth is stimulated and schooled by temptations of profit, to all manner of shifts and contrivances. Now upon the face of these very papers it appears, that this schooner is American built, and was American owned, and that within about two years she was naturalized in the French marine in the port of her departure, and her American title either really or nominally divested. At this period France and Portugal alone, of all the nations of Europe, possessed the painful and odious prerogative of covering under their flags a traffic, that all the great states of Europe had concurred in condemning to infamy. And by our own laws, which had been long sedulously directed against it, it was almost impracticable for any citizen to pursue the traffic under the flag of our own country, not only from the penalty of confiscation denounced against it, but from the offence being visited with capital punishment, as a most detestable piracy. Under such circumstances, if American citizens were engaged in the traffic, it is manifest, that they would conceal their interests under a foreign flag and passports, and wear any disguises, which might facilitate their designs, and favour their escape from punishment. And that such disguises might be cheaply bought, and promptly obtained through the instrumentality of private agents in foreign countries, who would be ready to assume a nominal ownership, no one, that has been much acquainted with the real business of this commerce, would be inclined to doubt or deny.

Sitting as I do in a court of the law of nations, accustomed to witness, in many shapes, the artifices of fraud, practised by those, whose interest lies in evading the salutary restraints of the laws, I think, that I should manifest a false delicacy and unjustifiable tenderness for abstract maxims, if I did not borrow somewhat of the experience of the world, to enable me to disentangle the network, which covers up unlawful enterprises. It is too much to ask a court of justice to shut its eyes against what is passing in the world, and to affect an ignorance, of what every man knows; to deal with the surface of causes, and pronounce them to be innocent, because no stain is permitted to appear there, or because guilt is not ostentatiously displayed to the first glance. It cannot be concealed, however humiliating the fact may be, that American citizens are, and have been, long engaged in the African slave trade, and that much of its present malignity is owing to the new stimulus administered at their hands. I speak what the records of this court show; what the records of the government show; what is loudly and vehemently complained of by that foreign government, which is so zealously enlisted in the cause of its abolition. Under such circumstances it cannot but be supposed, that an American court will have its suspicions alive; and that when it sees, that a vessel, recently American, is found in the traffic under foreign papers, something more will be necessary than the mere formalities of those papers, to establish the fact of a bona fide transfer to the ostensible foreign owners. It is doing no injustice to a foreign owner, to require in a traffic of this nature, so little reconcilable with good faith or sound morals, and prohibited by our laws, that he should give affirmative evidence, that the case has no admixture of American interests, when he sets up a title derived from American owners. It appears to me, that I should impose no hardship therefore in requiring the claimants in this case to show the bill of sale, by which they acquired their title, to give the names of the American owners; and to establish to a reasonable extent, that the transfer was for a valuable consideration. It is well known, that a bill of sale is the universal instrument, to which courts of admiralty look to establish the legal interests in ships; and this is equally a part of our own law and the law of France. And I take great pleasure in citing from an enlightened authority a confirmation of this doctrine. "It cannot," says Sir W. Scott, "be considered as any hardship upon the subjects of those countries, which still carry on the slave trade, that it (the court) should possess such a power (of inquiring into the real title of the ship.) It can be no unconstitutional breach of the law of nations to require, that when a claim is offered on the ground, that the property belongs to the subjects of a country, which still permits this trade, the burthen of giving proof of the property should lie upon those, who set it up, &c. It would be a monstrous thing, where a ship, admitted to have been, at one time, British property, is found engaging in this traffic, to say, that however imperfect the documentary evidence of the asserted transfer may be, and however startling the other circumstances of the case, no inquiry shall be made into the real ownership." The Donna Marianna, 1 Dod. 91, 92. Standing, then, as this cause does. I am not satisfied, that the property is owned as claimed; and before it would be restored, even if all other difficulties were overcome, I should feel myself bound to require farther proof of proprietary interest. If there were nothing more in the cause. I should pass such an order without hesitation.

But supposing the vessel to be established to be French, sailing under French papers, and employed in the African slave trade, the more important question is, whether this court is at liberty to entertain jurisdiction of the cause, or is bound to restore the property without any farther inquiry, remitting the party to the domestic forum.

It is contended, on behalf of the plaintiffs, that this court has a right to entertain jurisdiction, and is bound to reject the claim of the defendants: First, because the African slave trade is repugnant to the law of nations, secondly, because it is prohibited by the municipal laws of France. On the other side it is contended, that the trade is not repugnant to the law of nations; and if prohibited by the laws of France, it is a municipal regulation, which the tribunals of France are alone competent to inquire into and punish.

Before I proceed to the consideration of these points, it may be well to dispose of one or two preliminary considerations, which have been thrown out in the argument at the bar, and may assist us in coming to a correct determination as to the duty of the court. Whenever property is brought into a court of admiralty for adjudication upon a seizure for a forfeiture, or other cause cognizable there, the property is, in contemplation of law, in the custody of the court and cannot be withdrawn from its possession, but by some person, who shall establish a title to receive it. This is familiarly known as a rule of the prize court; but the principle is not less applicable to the instance court. In a suit in rem both parties are actors. If the libellant does not make out a title by forfeiture or otherwise, it does not follow, that the property is removed from the custody of the court, or that the claimant is to receive it. It may be true, that the libellant has failed to establish a title of forfeiture; and if the claimant has failed also in his title, the court would surrender its duty, if the property was delivered up to the latter. In point of fact it may turn out, that neither party can establish a title to the property; and if so, it will remain in the custody of the court, until a lawful owner appears and demonstates his title. If, for instance, upon a seizure for a forfeiture, no ground for condemnation should appear, and yet the claimant should found himself upon a title grossly illegal, or fraudulent, or piratical, there cannot be a doubt, that his claim must be rejected. "The general injustice of a claim," says that very learned person, who yet presides in the high court of admiralty, "may be the subject of cognizance in a municipal court. A claim founded on piracy, or any other act, which in the general estimation of mankind, is held to be illegal or immoral, might, I presume, be rejected in any court upon that ground alone." The Diana, 1 Dod. 95, 100. In the ordinary course of proceedings, it is certainly true, that a decree of acquittal is followed by a decree of restitution, but this arises from the fact, that the title of the claimant rarely becomes a matter of controversy. And this doctrine is founded on a general sense of justice, and for the convenience of mankind. A court of admiralty is solicitous to preserve the property, which falls into its hands, for the rightful owner; and if no such person appears before it, it will keep it in its custody, until such an owner shall appear. It would be most mischievous to the whole community to deliver over property to a claimant, simply because he asserts a claim, without proving a title. The case of salvage strongly illustrates this course of proceeding. If salvage be decreed in a suit in rem, it is paid out of the proceeds. If it be denied, either on general grounds, or as forfeited by misconduct, the property is retained for the real owner; and it may happen, that all the parties before the court have collusively instituted proceedings in the cause for the express purpose of defrauding the real owner. Under such circumstances, the court would be bound to retain the property, and dismiss all the parties before it for gross and fraudulent conduct, visiting them, as far as it could, with a proper penalty in the shape of costs. If, therefore, it should turn out in this investigation, that Lieut. Stockton was mistaken in his right of seizure, and the schooner cannot be condemned for a breach of our municipal laws, not having an American ownership, there will still remain a duty for the court to ascertain, whether the vessel can be restored to the claimants. If I am right in this view of the nature and authority of a court of admiralty acting in rem, the question, as to the jurisdiction of this court to make a farther and final inquiry into this cause, vanishes; and however unwelcome and perplexing the task, the court is bound to sift to the very bottom the merits of the present claim.

Another objection of a more general cast, and involving more general principles, is, that if this is a French vessel, the seizure was tortious, and no right, and consequently no jurisdiction, over this case can be founded on a wrong. It is said, that Lieut. Stockton could only claim to visit this vessel upon the high seas upon the ground of a right of search, which right never exists in a time of peace, and therefore his seizure was founded on an abuse of power, which cannot authorize an American court to use any evidence acquired in virtue of such abuse. I am free to admit, as a general proposition, that the right of visitation and search of foreign ships on the high seas can be exercised only in time of war, in virtue of a belligerent claim; and that there is no admitted principle or practice, which justifies its exercise in times of peace. It is unnecessary to scan opinions or authorities on the subject, since the point was not controverted at the argument, and it is no part of my duty to re-ascend to the source of its origin. But if from a denial of

a right of visitation and search on the high seas, it is meant to be concluded, that there exists no right of seizure of any vessel on the high seas, bearing a foreign flag, under any circumstances, I am not ready to admit the correctness of such a conclusion. The right of visitation and search is, in its nature, distinct from a right of seizure. A belligerent cruiser has a right to search all vessels found on the high seas, for the purpose of ascertaining their real, as well as assumed character, and capturing the property of its enemies. The exercise of such a right, being strictly lawful, involves the cruizer in no trespass or wrong, entitling the party searched to damages, if it shall turn out upon examination, that there was no ground for the search, and that the property is in all respects neutral. If, indeed, upon such search, the captor proceeds to capture the vessel as prize, and sends her in for adjudication, and there is no probable cause of capture, he is liable to responsibility in costs and damages. But this is not for the search, but for the subsequent capture; which, being without sufficient reason, is treated as a tortious act, and a usurpation of possession. It does not, therefore, by any means follow, that a right of search justifies a capture, so that the latter may not be deemed a gross violation of the rights of a foreign neutral ship. It is, indeed, difficult to perceive, how a tortious capture, jure belli, can clothe a party with any more rights, in any respect, either as to evidence, or grounds of condemnation, than a tortious seizure in time of peace. And the right of search, as such, neither protects nor aids a capture, if considered per se the latter is incapable of justification. But a right of seizure may exist on the high seas independently of any right of search, or the protection from damages, which that right guarantees. For instance, no one can doubt, that vessels and property in the possession of pirates may be lawfully seized on the high seas by any person, and brought in for adjudication. But such a seizure is at the peril of the party. If the property upon examination turns out not to be piratical, or piratically employed, the seizor is a trespasser ab initio, and liable, as such, to damages; and it will be no justification upon the principles of general law, that there was probable cause of seizure. And yet no one will be hardy enough to contend, that the mere right to seize property in the possession of pirates on the high seas, which right exists as well in peace, as in war, draws after it a right of visitation and search of every vessel found on the high seas, to ascertain, whether she be piratical or not, or whether her flag be assumed or genuine. If this example should not be thought unexceptionable. I may be permitted, under the sanction of that high tribunal, whose decisions I am bound to obey, to put one, that has passed in rem judicatem. It is now the settled doctrine of the supreme court, that if a foreign vessel has committed any offence within the territorial jurisdiction of another nation, by which a forfeiture is incurred, she may be seized any where upon the high seas by the ships of the nation, against which she has offended. And it is manifest that, in most cases, it cannot be ascertained, whether a ship descried on the high seas be the offending ship or not, without actual search and visitation. Yet it has never been supposed, that a general right of search grew out of this admitted right of seizure. On the contrary, it is the general understanding, that the seizor visits, in such cases, at his peril, and is excused and justified, not by probable cause, but by the fact, that the seizure is followed by a just condemnation.

It appears to me, also, that every nation has a right to seize the property of its own offending subjects on the high seas, whenever it has become subject to forfeiture; and it cannot, for a moment, be admitted, that the fact, that the property is disguised under a foreign flag, or foreign papers, interposes a just bar to the exercise of that right. What, then, is to be done? If it be said, that foreigners are not to be molested on the high seas, while engaged in their own innocent and lawful trade, it is no less true, that foreigners engaged in the fraudulent cover of the property of your own subjects, and, in concert with them, evading your own laws, are not to be protected in such illegal enterprises. In such a case you do not acquire a right of search which justifies your encroachment upon the private concerns of a foreign ship; but nevertheless, having a right to seize for breach of your own laws, you may seize at your peril; and if the case turns out to be innocent, you are responsible for damages; if guilty, you are justified by the event. Unless such a community of right be conceded to exist for purposes like those alluded to, the ocean would become a sanctuary for all sorts of offences; and evils, at least as alarming as those, with which we are threatened in this case, would afflict the whole commercial world. It is not lightly to be supposed, that any nation would be inclined to abuse any right, which it holds in common only with all other nations; and if it should choose, in the wantonness of power, to abuse it to the serious injury of other nations, the same remedy would exist, and none other, as for like oppressions practised within the range of its ordinary authority.

As to the other position, that if there exists no right of visitation and search, there cannot exist any right to use any evidence, which may be discovered by such search, I must be permitted to doubt, if that doctrine, in the full extent of its meaning, can be supported. In the ordinary administration of municipal law the right of using evidence does not depend, nor, as far as I have any recollection. has ever been supposed to depend upon the lawfulness or unlawfulness of the mode, by which it is obtained. If it is

competent or pertinent evidence, and not in its own nature objectionable, as having been created by constraint, or oppression, such as confessions extorted by threats or fraud, the evidence is admissible on charges for the highest crimes, even though it may have been obtained by a trespass upon the person, or by any other forcible and illegal means. The law deliberates not on the mode, by which it has come to the possession of the party, but on its value in establishing itself as satisfactory proof. In many instances, and especially on trials for crimes, evidence is often obtained from the possession of the offender by force or by contrivances, which one could not easily reconcile to a delicate sense of propriety, or support upon the foundations of municipal law. Yet I am not aware, that such evidence has upon that account ever been dismissed for incompetency.

If I am not much misled in my general recollection, cases of prize, which are emphatically under the administration of the law of nations, are not exempt from the introduction of evidence obtained by similar means. Force is there sometimes applied, and deception also, to meet the contrivances of fraud, and draw papers from the possession of parties, which may disclose the real truth of the transactions. It is matter of extreme doubt with me, whether any court of prize would feel itself at liberty to reject such evidence, even though it should be proved, that it was obtained by a personal trespass, or even by an aggravated constraint. If, independently of any supposed right of search, a seizure be made upon the high seas in a time of peace, and the evidence, on which condemnation is sought, either for a breach of municipal or national law, is obtained exclusively from the papers found on board after the seizure; yet if sufficient for the purpose of condemnation, it completely justifies the seizure. And it does not occur to my mind, what is the objection, that can legally be taken to the admission of such evidence. If these papers strip off the ostensible character of the property, and discover its real ownership, and the case be such, that a nation is justified in pronouncing condemnation, it seems not too much to assert, that a court of law is not bound to tax its ingenuity, to aid the offenders in escaping from justice. The question, whether the seizure be wrongful, depends upon the real facts, and not upon the colorable character of the transaction; and if the party may be lawfully dispossessed, when the evidence is obtained aliunde, it is not very easy to perceive, why it loses its force by being detected travelling with the very corpus delicti. If it be said, that you cannot avail yourself of discoveries unlawfully produced, nor take advantage of the consequences of your own wrong, it may with equal propriety be answered, that it is the very question in controversy, whether you are in the wrong, and that the evidence, if admitted, establishes the reverse. And, at all events, the maxim applies with equal force to the other party, who, if guilty of a public offence, ought not to be permitted to take advantage of his own wrong as a ground for an escape from the consequent forfeiture. Whatever may be the merits or demerits of the particular parties before the court, it seems to me, that being once in the lawful custody of the thing and of the evidence, the court is bound to dispose of it as the law, by which it is to regulate its judgment, requires. Nor do I consider these principles at all novel in the history or practice of jurisprudence. I need not go farther than to advert to some of the cases, which have been cited at the argument (The Fortuna, 1 Dod. 81; The Donna Marianna, Id. 91; The Diana, Id. 95; The Amedie, 1 Act. 240, 1 Dod. 84, note), and which I shall presently have occasion to mention more particularly, to shew, that courts of justice do not restrain themselves in the exercise of their powers to the mere case of right made out by the libellants. In those cases, which I am contented, at present, to consider merely as cases of capture, the courts by their solemn judgment established, that the captors had no right of condemnation, jure belli; and the cases were, so far as one might venture to conjecture from the state of the facts presented in the reports, so bare of any probable cause of capture, that the argument does not attempt to fix any suspicion upon them of a meditated violation of belligerent rights. It proceeds upon the sole ground, that there was an illegality in the voyage, which justified a rejection of the claims, independently of any rights of war. And the courts pronounced for the rejection of the claims accordingly; though but for this special ground, which was derived altogether from the papers and persons on board, the cases would seem to have called for damages and costs against the captors. It might have been as justly argued in those cases, as in this, that the capture was tortious, and that the captors could not by the right of search claim to obtain, or use, any evidence, except such as applied to the rights of war; and that evidence obtained by such a capture, applying to mere municipal forfeiture, was taking advantage of a wrong. But it is sufficient for my purpose, that the learned judges, who decided those causes, did not limit their doctrine to cases, where the capture was justifiable or excusable; but, on the contrary, from their language it is no rashness to conclude, that if the capture had been tortious, it would not, upon the principles held by them, have varied their judgment.

It may be, that I am in an error in entertaining these notions upon the objections now under consideration; but I should have great reconsideration; but I should have great reluctance in abandoning them, unless taught another doctrine by a tribunal, which I am bound implicitly to obey.

Another objection has been made to the nature of the present proceeding, as of an anomalous character; and it is asked, wheth-

er it be a cause belonging to the instance or prize side of the court. I have no inclination to look minutely into these proceedings, to see if in all respects they are perfectly regular according to the course of the admiralty; but I scruple not to declare, that in my judgment this is a mere civil proceeding on the instance side of the court to enforce a supposed forfeiture; and that it has nothing whatsoever to do with the proceedings of prize. Unless, therefore, the court can sustain the suit in its former character, it will dismiss it from its consideration without any regret, that it cannot entertain it for farther inquiry. As to that supposed novelty in the proceeding, so far as the information proceeds for a municipal forfeiture under the American laws, it is in the ordinary form; and so far as it seeks condemnation upon the asserted infraction of the law of nations, the novelty lies not in the form of proceeding, but in the question, whether the facts constitute an infraction of the law of nations. In the cause of The Diana, 1 Dod. 95–100, Sir Wm. Scott. in commenting on an analogous proceeding for the condemnation of a slave ship, did not deny the competency of a court of civil jurisdiction to adjudicate upon a question of this sort, upon proper allegations to direct its inquiries. If there be any right to be asserted by the libellants, I am not aware, that the mode, which is here adopted, is in substance, however it may be in form, exceptionable.

Having adverted to these preliminary considerations, I may now be permitted to proceed to the great points in controversy. And the first question naturally arising out of the asserted facts is, whether the African slave trade be prohibited by the law of nations; for, if it be so, it will not, I presume, be denied, that confiscation of the property ought to follow; for that is the proper penalty denounced by that law for any violation of its precepts; and the same reasons, which enforce that penalty ordinarily. apply with equal force to employment in this trade. The Fortuna, 1 Dod. 81; Madrazo v. Willes. 3 Barn. & Ald. 353.

I shall take up no time in the examination of the history of slavery, or of the question, how far it is consistent with the natural rights of mankind. That it may have a lawful existence, at least by way of punishment for crimes, will not be doubted by any persons, who admit the general right of society to enforce the observance of its laws by adequate penalties. That it has existed in all ages of the world, and has been tolerated by some. encouraged by others, and sanctioned by most, of the enlightened and civilized nations of the earth in former ages, admits of no reasonable question. That it has interwoven itself into the municipal institutions of some countries, and forms the foundation of large masses of property in a portion of our own country, is known to all

of us. Sitting, therefore, in an American court of judicature, I am not permitted to deny, that under some circumstances it may have a lawful existence; and that the practice may be justified by the condition, or wants, of society, or may form a part of the domestic policy of a nation. It would be unbecoming in me here to assert, that the state of slavery cannot have a legitimate existence, or that it stands condemned by the unequivocal testimony of the law of nations. But this concession carries us but a very short distance towards the decision of this cause. It is not, as the learned counsel for the government have justly stated, on account of the simple fact, that the traffic necessarily involves the enslavement of human beings, that it stands reprehended by the present sense of nations; but that it necessarily carries with it a breach of all the moral duties, of all the maxims of justice, mercy and humanity, and of the admitted rights, which independent Christian nations now hold sacred in their intercourse with each other. What is the fact as to the ordinary, nay, necessary course, of this trade? It begins in corruption, and plunder, and kidnapping. It creates and stimulates unholy wars for the purpose of making captives. It desolates whole villages and provinces for the purpose of seizing the young, the feeble, the defenceless, and the innocent. It breaks down all the ties of parent, and children, and family, and country. It shuts up all sympathy for human suffering and sorrows. It manacles the inoffensive females and the starving infants. It forces the brave to untimely death in defence of their humble homes and firesides, or drives them to despair and self-immolation. It stirs up the worst passions of the human soul, darkening the spirit of revenge, sharpening the greediness of avarice, brutalizing the selfish, envenoming the cruel, famishing the weak, and crushing to death the broken-hearted. This is but the beginning of the evils. Before the unhappy captives arrive at the destined market, where the traffic ends, one quarter part at least in the ordinary course of events perish in cold blood under the inhuman, or thoughtless treatment of their oppressors. Strong as these expressions may seem, and dark as is the colouring of this statement, it is short of the real calamities inflicted by this traffic. All the wars, that have desolated Africa for the last three centuries, have had their origin in the slave trade. The blood of thousands of her miserable children has stained her shores, or quenched the dying embers of her desolated towns, to glut the appetite of slave dealers. The ocean has received in its deep and silent bosom thousands more, who have perished from disease and want during their passage from their native homes to the foreign colonies. I speak not from vague rumours. or idle tales, but from authentic documents, and the known historical

details of the traffic,—a traffic, that carries away at least 50,000 persons annually from their homes and their families, and breaks the hearts, and buries the hopes, and extinguishes the happiness of more than double that number. See state papers of congress for 1821; report on the slave trade, February 9, 1821, page 59. "There is," as one of the greatest of modern statesmen has declared, "something of horror in it, that surpasses all the bounds of imagination." Mr. Pitt's speech on the slave trade, in 1792. It is of this traffic, thus carried on, and necessarily carried on, beginning in lawless wars, and rapine, and kidnapping, and ending in disease, and death, and slavery,—it is of this traffic in the aggregate of its accumulated wrongs, that I would ask, if it be consistent with the law of nations? It is not by breaking up the elements of the case into fragments, and detaching them one from another, that we are to be asked of each separately, if the law of nations prohibits it. We are not to be told, that war is lawful, and slavery lawful, and plunder lawful, and the taking away of life is lawful, and the selling of human beings is lawful. Assuming that they are so under circumstances, it establishes nothing. It does not advance one jot to the support of the proposition, that a traffic, that involves them all, that is unnecessary, unjust, and inhuman, is countenanced by the eternal law of nature, on which rests the law of nations.

Now the law of nations may be deduced, first, from the general principles of right and justice, applied to the concerns of individuals, and thence to the relations and duties of nations; or, secondly, in things indifferent or questionable, from the customary observances and recognitions of civilized nations; or, lastly, from the conventional or positive law, that regulates the intercourse between states. What, therefore, the law of nations is, does not rest upon mere theory, but may be considered as modified by practice, or ascertained by the treaties of nations at different periods. It does not follow, therefore, that because a principle cannot be found settled by the consent or practice of nations at one time, it is to be concluded, that at no subsequent period the principle can be considered as incorporated into the public code of nations. Nor is it to be admitted, that no principle belongs to the law of nations, which is not universally recognised, as such, by all civilized communities, or even by those constituting, what may be called, the Christian states of Europe. Some doctrines, which we, as well as Great Britain, admit to belong to the law of nations, are of but recent origin and application, and have not, as yet, received any public or general sanction in other nations; and yet they are founded in such a just view of the duties and rights of nations, belligerent and neutral, that we have not hesitated to enforce them by the penalty of confiscation. There are other doctrines, again, which have met the decided hostility of some of the European states, enlightened as well as powerful, such as the right of search, and the rule, that free ships do not make free goods. which, nevertheless, both Great Britain and the United States maintain, and in my judgment with unanswerable arguments, as settled rules in the law of prize, and scruple not to apply them to the ships of all other nations. And yet, if the general custom of nations in modern times, or even in the present age, recognized an opposite doctrine. it could not, perhaps, be affirmed, that that practice did not constitute a part, or, at least, a modification, of the law of nations. But I think it may be unequivocally affirmed, that every doctrine, that may be fairly deduced by correct reasoning from the rights and duties of nations, and the nature of moral obligation, may theoretically be said to exist in the law of nations; and unless it be relaxed or waived by the consent of nations, which may be evidenced by their general practice and customs, it may be enforced by a court of justice, whenever it arises in judgment. And I may go farther and say, that no practice whatsoever can obliterate the fundamental distinction between right and wrong, and that every nation is at liberty to apply to another the correct principle, whenever both nations by their public acts recede from such practice, and admits the injustice or cruelty of it.

Now in respect to the African slave trade, such as it has been described to be, and in fact is, in its origin, progress, and consummation, it cannot admit of serious question, that it is founded in a violation of some of the first principles, which ought to govern nations. It is repugnant to the great principles of Christian duty, the dictates of natural religion, the obligations of good faith and morality, and the eternal maxims of social justice. When any trade can be truly said to have these ingredients, it is impossible, that it can be consistent with any system of law, that purports to rest on the authority of reason or revelation. And it is sufficient to stamp any trade as interdicted by public law, when it can be justly affirmed, that it is repugnant to the general principles of justice and humanity. Now there is scarcely a single maritime nation of Europe, that has not in the most significant terms, in the most deliberate and solemn conferences, acts, or treaties, acknowledged the injustice and inhumanity of this trade; and pledged itself to promote its abolition. I need scarcely advert to the conferences at Vienna, at Aix-la-Chapelle, and at London, on this interesting subject, as they have been cited at the argument of this cause, and authenticated by our own government, to show what may be emphatically called the sense of Europe upon this point. France, in particular, at the conferences at Vienna, in 1815, engaged to use "all the means at

her disposal, and to act in the employment of these means with all the zeal and perseverance due to so great and noble a cause" (the abolition of the slave trade). And accordingly, in the treaty of peace between her and Great Britain, France, expressing her concurrence without reserve in the sentiments of his Britannic majesty with respect to this traffic, admits it to be "repugnant to the principles of natural justice, and of the enlightened age, in which we live;" and, at a short period afterwards. the government of France informed the British government, that it had "issued directions in order, that on the part of France the traffic in slaves may cease from the present time everywhere and forever." The conduct and opinions of Great Britain, honorably and zealously. and I may add, honestly, as she has been engaged in promoting the universal abolition of the trade, are too notorious, to require a pointed enumeration. She has through her parliament expressed her abhorrence of the trade in the most marked terms. as repugnant to justice and humanity; she has punished it as a felony, when carried on by her subjects; and she has recognized through her judicial tribunals the doctrine, that it is repugnant to the law of nations. Our own country, too, has firmly and earnestly pressed forward in the same career. The trade has been reprobated and punished, as far as our authority extended, from a very early period of the government; and by a very recent statute. to mark at once its infamy and repugnance to the law of nations, it has been raised in the catalogue of public crimes to the bad eminence of piracy. I think, therefore, that I am justified in saying, that at the present moment the traffic is vindicated by no nation, and is admitted by almost all commercial nations as incurably unjust and inhuman. It appears to me. therefore, that in an American court of judicature, I am bound to consider the trade an offence against the universal law of society and in all cases, where it is not protected by a foreign government, to deal with it as an offence carrying with it the penalty of confiscation. And I cannot but think. notwithstanding the assertion at the bar to the contrary, that this doctrine is neither novel nor alarming. That it stands on principles of sound sense and general policy, and, above all, of moral justice. And I confess. that I should be somewhat startled, if any nation, sincerely anxious for the abolition, and earnest in its duty, should interpose its influence to arrest its universal adoption.

There is an objection urged against the doctrine, which is here asserted, that ought not to be passed over in silence; and that is, if the African slave trade is repugnant to the law of nations. no nation can rightfully permit its subjects to carry it on, or exempt them from obedience to that law; for it is said, that no nation can privilege itself to commit a crime against the law of nations by a mere municipal regulation of its own. In a sense the proposition is true, but not universally so. No nation has a right to infringe the law of nations, so as thereby to produce an injury to any other nation. But if it does, this is understood to be an injury, not against all nations, which all are bound or permitted to redress; but which concerns alone the nation injured. The independence of nations guarantees to each the right of guarding its own honor, and the morals and interests of its own subjects. No one has a right to sit in judgment generally upon the actions of another; at least to the extent of compelling its adherence to all the principles of justice and humanity in its domestic concerns. If a nation were to violate as to its own subjects in its domestic regulation the clearest principles of public law, I do not know, that that law has ever held them amenable to the tribunals of other nations for such conduct. It would be inconsistent with the equality and sovereignty of nations. which admit no common superior. No nation has ever yet pretended to be the custos morum of the whole world; and though abstractedly a particular regulation may violate the law of nations, it may sometimes, in the case of nations, be a wrong without a remedy. Then how stands judicial authority on the subject? It appears to me, speaking with all possible deference for those, who may entertain a different opinion, that the case of The Amedie (1 Act. 240, 1 Dod. 84, note) is directly in point; and, unless the principles there stated can be shaken, they must govern the case now in judgment. Sir Wm. Grant, in delivering the judgment of the court of appeals in The Amedie. after adverting to the former state of the British law on the subject of the African slave trade. uses the following language, which I quote the more readily, as I know not, how in so concise and luminous a manner to convey the sentiments, which on this subject I deliberately entertain. "But," says that eminent judge, "by the alteration, which has since taken place in our law, the question now stands upon very different grounds. We do now, and did at the time of this capture, take an interest in preventing that traffic, in which this ship was engaged. The slave trade has since been totally abolished in this country, and our legislature has declared, that the African slave trade is contrary to the principles of justice and humanity. Whatever opinion, as private individuals, we before might have entertained upon the nature of this trade, no court of justice could with propriety have assumed such a position, as the basis of any of its decisions, whilst it was permitted by our own laws. But we do now lay down as a principle, that this is a trade, which cannot, abstractedly speaking. be said to have a legitimate existence. I say, abstractedly speaking, because we cannot legislate for

other countries; nor has this country, a right to control any foreign legislature, that may think proper to dissent from this doctrine, and give permission to its subjects to prosecute this trade. We cannot certainly compel the subjects of other nations to observe any other, than the first and generally received principles of universal law. But thus far we are now entitled to act according to our law, and to hold that, prima facie, the trade is altogether illegal, and thus to throw on a claimant the burthen of proof, in order to shew, that by the particular law of his own country he is entitled to carry on this traffic. As the case now stands, we think, that no claimant can be heard in an application to a court of prize for the restoration of the human beings he carried unjustly to another country for the purpose of disposing of them as slaves. The consequence of making such a proof it is not now necessary to determine; but where it cannot be made, the party must be considered to have failed in establishing his asserted right. We are of opinion, upon the whole, that persons engaged in such a trade cannot, upon principles of universal law, have a right to be heard upon a claim of this nature in any court."

Such is the doctrine sanctioned by the highest prize court known to British jurisprudence. I consider it, as the high court of admiralty has considered it, as establishing the principle, that any trade contrary to the general law of nations, although not tending to, or accompanied with, any infraction of the belligerent rights of that country, whose tribunals are called to consider it, may subject the vessel employed in that trade to confiscation; and it matters not in what stage of the employment. whether in the inception or the prosecution, or the consummation. of it, the vessel is arrested. The Fortuna, 1 Dod. 81, 85, 86. It has been said, that this doctrine first arose in a case of capture, jure belli, and was applied by a court of prize. Be it so; but the doctrine is not limited in its terms or purport to cases of this sort. The capture, as a belligerent capture, was tortious and without any reasonable cause; and the court admitted, that there had been no violation of belligerent rights. But it applied the doctrine upon principles of universal law, and asserted, that it might be applied to a claim of such a nature in any court. The Fortuna, Id., and The Donna Marianna, Id. 91, in which the doctrine was followed, were also cases of capture; but although it is pretty clear, that there were some lurking doubts as to the propriety of the doctrine in the mind of the court, there was not the slightest attempt to place it upon any ground, that limited it to the prize jurisdiction. In the case of The Diana, Id. 95, which, at the interval of nearly a year afterwards, called again for the application of the general doctrine, no such distinction was even alluded to, although that was clearly, in the judgment of the court itself, a case on the instance side of the court, where condemnation was directly sought on an information for a forfeiture for an asserted employment in the slave trade. It turned out upon the investigation of the facts, that the vessel was Swedish; and, as such, upon the supposition, that Sweden permitted the traffic to her subjects, restitution was decreed. But the court unequivocally admitted the propriety of applying the doctrine to the case. if the Swedish law were proved to be deficient. I think, then, I stand firm upon the position, that up to the period of these adjudications, no distinction, like that now contended for, was in the contemplation of the court; and certainly no such distinction can in reason be applied to the doctrine in The Amedie. Whatever, indeed, may be the extent of the belligerent right of search and visitation, it does not authorize a subsequent capture, unless for just cause of suspicion; and if the search be in this respect unproductive, it cannot be, that the capture is less tortious on account of the exercise of this right, than it would be, if no such right existed. The capture is just as wrongful, as a seizure in time of peace would be, and no more. It violates the right of the foreign ship just as much, and no more, than such a seizure; and if, notwithstanding such a tortious capture, the party may avail himself of a ground of condemnation for the breach of universal law, independent of belligerent rights, he may, for the same reason, avail himself of it in case of such a tortious seizure. In truth, however, the law looks not to niceties of this sort. If for any cause, precedent or subsequent. known at the beginning or known at the end, the property is condemned, the party is justified and retroactively for all purposes the capture, or seizure, or forcible possession, call it what you may, is deemed rightful and bona fide.

The case of Le Louis, 2 Dod. 210, which followed after a period of almost four years, has been pressed upon the attention of the court, and certainly is entitled to the most respectful and cautious examination. I will not yield to any person in reverence for the profound learning and talents of the accomplished judge. by whom that decision was pronounced. His judgments have been justly the admiration of Europe and America; and will be read for instruction, for beauty of illustration, for felicity of style, and for unambitious, but lofty principles, long after their illustrious author is gathered to the fathers, who have enlightened and improved mankind; as long indeed, in my humble belief, as the common language of his and our country shall indicate to mankind our common lineage. Still, however, it is my duty, painful and responsible as it may be, and with whatever hesitation and humility, when I am led to differ from other minds, with which I have not the least title to be brought in comparison; I say. it is my duty

to follow the dictates of my own judgment in all cases, where my judicial conscience is not already bound by the decisions of the highest appellate court of the government, under which I sit. The case of Le Louis may be distinguished from that before the court in several circumstances. The seizure was made at a time, when no public ordinance of France prohibited the slave trade, and before the recent discussions at Aix-la-Chapelle. Upon the very face of the information the vessel was admitted to be French, and seized as such, and condemnation was sought upon two grounds—First, the resistance of the right of search of a British cruiser in a time of peace; and secondly, because the trade was contrary to the laws of France and the law of nations. The whole ground, therefore, excepting that of forfeiture under the law of nations, was removed from the cause, for no such right of search in point of law existed, and no such law of France in point of fact existed. And it is perfectly clear upon the doctrine of the other cases already cited, that it was necessary, that a prohibitory law of France should concur with the public law of nations, before a foreign tribunal could apply the penalty of confiscation. The cause was therefore on its merits correctly decided in perfect harmony with the former cases. But the learned judge, in a most elaborate and masterly manner, discusses the general question, and comes to the conclusion, that the African slave trade is not a crime against the law of nations; and that the seizure of a foreign ship, engaged in that trade, although it is prohibited by the nation, to which she belongs, cannot be rightfully made by a British cruiser, and that a suit for condemnation of such a ship cannot be rightfully maintained in a British court.

The first observation that I am called upon to make respecting this case is, that I do not find, that the court any where attempts to distinguish between this and the preceding cases, by limiting the doctrine of rejecting claims for illegality of traffic to cases of capture during war, or suits in the prize jurisdiction. Nor does it occur to me, meaning to speak with the greatest diffidence of my own judgment, that a distinction of that nature would be quite consistent with what fell from the court in the case of The Diana, 1 Dod. 95. In the next place, I find myself utterly at a loss to comprehend, how the fundamental doctrine of the case of The Amedie, and the other cases already cited, that the slave trade, abstractedly speaking, cannot have a legal existence, and that it is repugnant to the principles of universal law, and the law of nations, can consist with the unequivocal denial of the same doctrine in the case of Le Louis. I find myself driven, therefore, to the conclusion, that the last case is meant silently to abandon and repudiate the whole doctrine, on which the former cases rest. In this conflict of authority and learning, of matured and deeply weighed decisions, it is no rashness

to follow those, which on the whole seem built on the most solid grounds of justice, public policy, and principle. In the struggle, which my own mind has undergone upon this occasion, I cannot escape from the conclusion, that the reasoning of Sir William Grant has not been overturned, even if it should be thought in any measure shaken; and that if I were to adjudge otherwise, it would be following another authority against the dictates of my deliberate judgment. And I think I may call in aid the opinion of a court of common law, though perhaps not, in general, the best qualified court to entertain the discussion of questions of national law, to show, that the doctrine of the former cases meets the entire approbation of such tribunals. I allude to the case of Madrazo v. Willes, 3 Barn. & Ald. 353, and particularly the opinion of Mr. Justice Best, where, though single expressions may appear to militate with my own views on this subject, the fair result of the opinions stands in perfect consistency with the doctrine of The Amedie.

But supposing, that the opinions already expressed by the court are as erroneous, as the counsel for the claimant contends them to be, and that the law of nations is to be exclusively derived from the practice of nations, and the practice is in favor of the African slave trade; still there remains another obstacle to the recovery of the property by the claimants, which must be displaced before his title is unimpeachable. And that is, that the African slave trade stands prohibited by the positive municipal regulations of France. This has not been denied at the argument, at least to the extent of reaching a case, where the trade is attempted to be carried on to a French colony, which is exactly the case before the court, if any slave voyage was intended by the owners. The French ordinance of the 8th of January, 1817, comes up to this point, and purports to be made in execution of the obligations by treaty to abolish the slave trade, however inadequate it may be justly deemed for this purpose. But I think, independently of this document, (which is admitted to exist) by the general principles already asserted, the onus probandi rests on the claimants to establish the legitimate existence of the trade in France; and more especially since her recent declarations in the face of all Europe, that she had caused it to be everywhere abolished. They have not pretended to offer any proof on this point: and the argument of their counsel proceeds upon the supposition of an actual prohibition.

It is said, that the cognizance of penalties and forfeitures for breaches of municipal regulations exclusively belongs to the tribunals of the nation, by whom they are enacted. And this, in a general sense, with reference to the right to originate proceedings for the sole purpose of enforcing such penalties and forfeitures, may be true. But that any court may take notice of the laws of a foreign country, whether civil or penal,

which come incidentally before it in the exercise of its general jurisdiction over persons or property, can admit of as little dispute. We know, that the lex loci is often applied in courts of justice to enforce rights and redress wrongs; and that contracts and titles, which cannot have a legal existence in the country, where they have their origin, are held void every where. In respect to mere municipal regulations, the general rule certainly is, that courts do not take notice of them with a view to their direct enforcement. It is often said, that no country takes notice of the revenue laws of a foreign country, or holds itself bound to repudiate commercial transactions, which violate them. But this is a rule adopted from a motive of policy or comity; and is not an essential ingredient in any system of the law of nations. If any nation were disposed to discountenance any smuggling in violation of the laws of a foreign country, and in cases coming regularly before its own courts were to refuse to recognize any rights of property founded on such violation, I am not able to perceive, what just ground of complaint the offended nation could have against such conduct. It seems to me, that it might with more justice complain of the refusal to enforce such laws, and to discountenance such violations. But where a title to property originates in what a nation deems in its own subjects a public crime, more especially if it be an aggravated crime founded on fraud and rapine; and it finds, that another nation deems it a crime of a like nature, and prohibits it as such, and confiscates the property of its subjects engaged in the commission of it, I do not perceive, why such property, so polluted by crimes, should, if it falls into the custody of a court of the former nation, be so sacred from judicial touch, that it must be restored to the wrongdoer. And I would ask, where is the authority, that requires such a court to act in this manner, when the public policy of its own, as well as of the foreign, government is avowedly engaged in endeavoring to suppress that crime? If in a case before this court, acting in rem, a title to property, founded on theft or other municipal crime, or on a fraud committed in a foreign country, were set up, until my judicial conscience is better instructed, I should have extreme difficulty in recognising such a title, if the property was once legally in the custody of the court.

In the case now before me, on the face of the libel, the court certainly has jurisdiction; for if the allegation, as to the property being engaged in the slave trade against our laws, be well founded, it justifies condemnation. But jurisdiction does not depend upon the event of the suit, but upon the right to entertain the suit, and proceed by inquiry to settle its merits. In this respect the case before me stands differently from that of Le Louis. It is, therefore, in the investigation of the merits of this case, that I am met by the title of French subjects to the property; and that title, if the vessel be engaged in the slave trade, is a title connected with a crime against France, and which, by French law, becomes forfeited. In this posture of the cause, it does not occur to me, that any principle of general justice, or of national comity, or of universal law, requires this court to surrender up the property to the claimants, however well it might be disposed to surrender it to the sovereign of France. If, therefore, this ground alone were before the court, as at present advised, I should incline to reject the claim for the breach of this municipal law of France, which our country recognises as a breach, not of mere positive law, but of the immutable principles of justice.

If I am asked, what would be the predicament of this cause under the views, which have been suggested, I answer, that if the vessel be not American, engaged in a traffic contravening our laws, Lieut. Stockton and his associates can have no title to seek condemnation for any interest of their own, for a share in the forfeiture accrues to them only, when the case is reached by our laws; and the libel, so far as it is founded on these allegations, must be dismissed. Then as to the claimants, their claim being rejected, there would be no person judicially before the court to claim restitution. The property, then, must either be condemned to the United States generally, as unclaimed property, or forfeited property, upon principles analogous to those adopted in The Etrusco, 4 C. Rob. Adm. 262, note 1, or it must remain in the custody of the court, to be delivered up to the sovereign of France, if he should choose to interpose a claim, or assert a right to proceed against it in his own courts for the supposed forfeiture. It appears to me, that the latter is the true course. It enables the foreign sovereign to exercise complete jurisdiction over the case, if he shall prefer to have it remitted to his own courts for adjudication. It enforces the policy, common to both nations, of repressing an odious traffic, which is denounced by both. It makes our own country, not a principal, but an auxiliary, in enforcing the interdict of France, and subserves the great interests of universal justice. I am not aware of any obstacle in the constitution of a court of admiralty, proceeding in rem, to the adoption of such a practice; and I am greatly mistaken, if it does not carry in its bosom the seeds of peace and conciliation, instead of animosity and recrimination.

Thus far I have proceeded in the cause without reference to any other claims, but those asserted in the original libel and answer. But at a late period in this cause, by direction of the president, a suggestion has been filed by the district attorney, expressing a willingness to yield up the vessel to the French government, or its consular

agent, for the purpose of remitting the cause for ultimate adjudication to the domestic forum of the sovereign of the owners. To a suggestion of this nature this court is bound to listen with the most respectful attention. It is understood to be, not a direction to the court, for that is beyond the reach of executive authority, but an intimation of the wishes of the government, so far as its own rights are concerned, to spare the court any farther investigation. If it had seemed fit to all the parties, whose interests are before the court, to agree to the course held out by this suggestion, it would have relieved my mind from a weight of responsibility, which has most heavily pressed upon it. But the French claimants resist this course, and require, that the property should be delivered over to their personal possession, and not to the possession of their sovereign. Under such circumstances this court must follow the duty prescribed to it by law, independently of any wishes of our own government or of France. I have been compelled, therefore, reluctantly to travel over the whole merits of the cause, and to decide it with reference to the French owners upon the great principles, on which it has been argued.

After listening to the very able, eloquent, and learned arguments delivered at the bar on this occasion—after weighing the authorities, which bear on the case, with mature deliberation,—after reflecting anxiously and carefully upon the general principles, which may be drawn from the law of nations to illustrate or confirm them, I have come to the conclusion, that the slave trade is a trade prohibited by universal law, and by the law of France, and that, therefore, the claim of the asserted French owners must be rejected. That claim being rejected, I feel myself at perfect liberty, with the express consent of our own government, to decree, that the property be delivered over to the consular agent of the king of France, to be dealt with according to his own sense of duty and right. No one can be more sensible than myself of the real magnitude and intricacy of the questions involved in this cause. It becomes me, therefore, to speak with great distrust and diffidence of my own judgment respecting its merits. But I think, I have a right to say, that the American courts of judicature are not hungry after jurisdiction in foreign causes, or desirous to plunge into the endless perplexities of foreign jurisprudence. If I could have had my choice of causes, this class is not that, which would have been selected from peculiar favour. But it is to be remembered, that while the court is not rashly to engage in asserting jurisdiction over foreign causes from the odium, which is justly attached to a traffic conceived in atrocious and unfeeling cruelty, and stained and sealed with blood; it has also a public duty to perform, from which it dare not shrink, to pronounce its own judgment of the law, and to leave it to more wise and learned minds to correct any errors, into which it may inadvertently have fallen.