(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KIOBEL, INDIVIDUALLY AND ON BEHALF OF HER LATE HUSBAND KIOBEL, ET AL. *v.* ROYAL DUTCH PETROLEUM CO. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 10–1491. Argued February 28, 2012—Reargued October 1, 2012— Decided April 17, 2013

Petitioners, Nigerian nationals residing in the United States, filed suit in federal court under the Alien Tort Statute, alleging that respondents—certain Dutch, British, and Nigerian corporations—aided and abetted the Nigerian Government in committing violations of the law of nations in Nigeria. The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. §1350. The District Court dismissed several of petitioners' claims, but on interlocutory appeal, the Second Circuit dismissed the entire complaint, reasoning that the law of nations does not recognize corporate liability. This Court granted certiorari, and ordered supplemental briefing on whether and under what circumstances courts may recognize a cause of action under the ATS, for violations of the law of nations occurring within the territory of a sovereign other than the United States.

*Held*: The presumption against extraterritoriality applies to claims under the ATS, and nothing in the statute rebuts that presumption. Pp. 3–14.

(a) Passed as part of the Judiciary Act of 1789, the ATS is a jurisdictional statute that creates no causes of action. It permits federal courts to "recognize private claims [for a modest number of international law violations] under federal common law." *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 732. In contending that a claim under the ATS does not reach conduct occurring in a foreign sovereign's territo-

ry, respondents rely on the presumption against extraterritorial application, which provides that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none," *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. ___, ___. The presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 248. It is typically applied to discern whether an Act of Congress regulating conduct applies abroad, see, *e.g., id.,* at 246, but its underlying principles similarly constrain courts when considering causes of action that may be brought under the ATS. Indeed, the danger of unwarranted judicial interference in the conduct of foreign policy is magnified in this context, where the question is not what Congress has done but what courts may do. These foreign policy concerns are not diminished by the fact that *Sosa* limited federal courts to recognizing causes of action only for alleged violations of international law norms that are " 'specific, universal, and obligatory," 542 U. S., at 732. Pp. 3–6.

(b) The presumption is not rebutted by the text, history, or purposes of the ATS. Nothing in the ATS's text evinces a clear indication of extraterritorial reach. Violations of the law of nations affecting aliens can occur either within or outside the United States. And generic terms, like "any" in the phrase "any civil action," do not rebut the presumption against extraterritoriality. See, *e.g., Morrison, supra*, at ___. Petitioners also rely on the common-law "transitory torts" doctrine, but that doctrine is inapposite here; as the Court has explained, "the only justification for allowing a party to recover when the cause of action arose in another civilized jurisdiction is a well-founded belief that it was a cause of action in that place," *Cuba R. Co.* v. *Crosby*, 222 U. S. 473, 479. The question under *Sosa* is not whether a federal court has jurisdiction to entertain a cause of action provided by foreign or even international law. The question is instead whether the court has authority to recognize a cause of action under U. S. law to enforce a norm of international law. That question is not answered by the mere fact that the ATS mentions torts.

The historical background against which the ATS was enacted also does not overcome the presumption. When the ATS was passed, "three principal offenses against the law of nations" had been identified by Blackstone: violation of safe conducts, infringement of the rights of ambassadors, and piracy. *Sosa, supra,* at 723, 724. Prominent contemporary examples of the first two offenses—immediately before and after passage of the ATS—provide no support for the proposition that Congress expected causes of action to be brought under the statute for violations of the law of nations occurring abroad. And although the offense of piracy normally occurs on the high seas,

Syllabus

beyond the territorial jurisdiction of the United States or any other country, applying U. S. law to pirates does not typically impose the sovereign will of the United States onto conduct occurring within the territorial jurisdiction of another sovereign, and therefore carries less direct foreign policy consequences. A 1795 opinion of Attorney General William Bradford regarding the conduct of U. S. citizens on both the high seas and a foreign shore is at best ambiguous about the ATS's extraterritorial application; it does not suffice to counter the weighty concerns underlying the presumption against extraterritoriality. Finally, there is no indication that the ATS was passed to make the United States a uniquely hospitable forum for the enforcement of international norms. Pp. 6–14.

621 F. 3d 111, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined. KENNEDY, J., filed a concurring opinion. ALITO, J., filed a concurring opinion, in which THOMAS, J., joined. BREYER, J., filed an opinion concurring in the judgment, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–1491

ESTHER KIOBEL, INDIVIDUALLY AND ON BEHALF OF HER LATE HUSBAND, DR. BARINEM KIOBEL, ET AL., PETITIONERS *v.* ROYAL DUTCH PETROLEUM CO. ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[April 17, 2013]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Petitioners, a group of Nigerian nationals residing in the United States, filed suit in federal court against certain Dutch, British, and Nigerian corporations.  Petitioners sued under the Alien Tort Statute, 28 U. S. C. §1350, alleging that the corporations aided and abetted the Nigerian Government in committing violations of the law of nations in Nigeria.  The question presented is whether and under what circumstances courts may recognize a cause of action under the Alien Tort Statute, for violations of the law of nations occurring within the territory of a sovereign other than the United States.

I

Petitioners were residents of Ogoniland, an area of 250 square miles located in the Niger delta area of Nigeria and populated by roughly half a million people.  When the complaint was filed, respondents Royal Dutch Petroleum Company and Shell Transport and Trading Company, p.l.c., were holding companies incorporated in the Nether-

lands and England, respectively. Their joint subsidiary, respondent Shell Petroleum Development Company of Nigeria, Ltd. (SPDC), was incorporated in Nigeria, and engaged in oil exploration and production in Ogoniland. According to the complaint, after concerned residents of Ogoniland began protesting the environmental effects of SPDC's practices, respondents enlisted the Nigerian Government to violently suppress the burgeoning demonstrations. Throughout the early 1990's, the complaint alleges, Nigerian military and police forces attacked Ogoni villages, beating, raping, killing, and arresting residents and destroying or looting property. Petitioners further allege that respondents aided and abetted these atrocities by, among other things, providing the Nigerian forces with food, transportation, and compensation, as well as by allowing the Nigerian military to use respondents' property as a staging ground for attacks.

Following the alleged atrocities, petitioners moved to the United States where they have been granted political asylum and now reside as legal residents. See Supp. Brief for Petitioners 3, and n. 2. They filed suit in the United States District Court for the Southern District of New York, alleging jurisdiction under the Alien Tort Statute and requesting relief under customary international law. The ATS provides, in full, that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. §1350. According to petitioners, respondents violated the law of nations by aiding and abetting the Nigerian Government in committing (1) extrajudicial killings; (2) crimes against humanity; (3) torture and cruel treatment; (4) arbitrary arrest and detention; (5) violations of the rights to life, liberty, security, and association; (6) forced exile; and (7) property destruction. The District Court dismissed the first, fifth, sixth, and seventh claims, reasoning that the

facts alleged to support those claims did not give rise to a violation of the law of nations. The court denied respondents' motion to dismiss with respect to the remaining claims, but certified its order for interlocutory appeal pursuant to §1292(b).

The Second Circuit dismissed the entire complaint, reasoning that the law of nations does not recognize corporate liability. 621 F. 3d 111 (2010). We granted certiorari to consider that question. 565 U. S. ___ (2011). After oral argument, we directed the parties to file supplemental briefs addressing an additional question: "Whether and under what circumstances the [ATS] allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States." 565 U. S. ___ (2012). We heard oral argument again and now affirm the judgment below, based on our answer to the second question.

## II

Passed as part of the Judiciary Act of 1789, the ATS was invoked twice in the late 18th century, but then only once more over the next 167 years. Act of Sept. 24, 1789, §9, 1 Stat 77; see *Moxon* v. *The Fanny*, 17 F. Cas. 942 (No. 9,895) (DC Pa. 1793); *Bolchos* v. *Darrel*, 3 F. Cas. 810 (No. 1,607) (DC SC 1795); *O'Reilly de Camara* v. *Brooke*, 209 U. S. 45 (1908); *Khedivial Line, S.A.E.* v. *Seafarers' Int'l Union*, 278 F. 2d 49, 51–52 (CA2 1960) (*per curiam*). The statute provides district courts with jurisdiction to hear certain claims, but does not expressly provide any causes of action. We held in *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 714 (2004), however, that the First Congress did not intend the provision to be "stillborn." The grant of jurisdiction is instead "best read as having been enacted on the understanding that the common law would provide a cause of action for [a] modest number of international law violations." *Id.*, at 724. We thus held that federal courts

may "recognize private claims [for such violations] under federal common law." *Id.,* at 732. The Court in *Sosa* rejected the plaintiff's claim in that case for "arbitrary arrest and detention," on the ground that it failed to state a violation of the law of nations with the requisite "definite content and acceptance among civilized nations." *Id.,* at 699, 732.

The question here is not whether petitioners have stated a proper claim under the ATS, but whether a claim may reach conduct occurring in the territory of a foreign sovereign. Respondents contend that claims under the ATS do not, relying primarily on a canon of statutory interpretation known as the presumption against extraterritorial application. That canon provides that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none," *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 6), and reflects the "presumption that United States law governs domestically but does not rule the world," *Microsoft Corp.* v. *AT&T Corp.*, 550 U. S. 437, 454 (2007).

This presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 248 (1991) (*Aramco*). As this Court has explained:

> "For us to run interference in . . . a delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed. It alone has the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident and retaliative action so certain." *Benz* v. *Compania Naviera Hidalgo, S. A.*, 353 U. S. 138, 147 (1957). The presumption against extraterritorial application helps ensure that the Judiciary does not erroneously adopt

an interpretation of U. S. law that carries foreign pol-
icy consequences not clearly intended by the political
branches.

We typically apply the presumption to discern whether
an Act of Congress regulating conduct applies abroad.
See, *e.g., Aramco, supra,* at 246 ("These cases present the
issue whether Title VII applies extraterritorially to regu-
late the employment practices of United States employers
who employ United States citizens abroad"); *Morrison,
supra*, at \_\_\_ (slip op., at 4) (noting that the question of
extraterritorial application was a "merits question," not a
question of jurisdiction).  The ATS, on the other hand, is
"strictly jurisdictional."  *Sosa*, 542 U. S., at 713.  It does
not directly regulate conduct or afford relief.  It instead
allows federal courts to recognize certain causes of action
based on sufficiently definite norms of international law.
But we think the principles underlying the canon of inter-
pretation similarly constrain courts considering causes of
action that may be brought under the ATS.

Indeed, the danger of unwarranted judicial interference
in the conduct of foreign policy is magnified in the context
of the ATS, because the question is not what Congress has
done but instead what courts may do.  This Court in *Sosa*
repeatedly stressed the need for judicial caution in consid-
ering which claims could be brought under the ATS, in
light of foreign policy concerns.  As the Court explained,
"the potential [foreign policy] implications . . . of recog-
nizing . . . . causes [under the ATS] should make courts
particularly wary of impinging on the discretion of the
Legislative and Executive Branches in managing foreign
affairs."  *Id.*, at 727; see also *id.*, at 727–728 ("Since many
attempts by federal courts to craft remedies for the viola-
tion of new norms of international law would raise risks of
adverse foreign policy consequences, they should be under-
taken, if at all, with great caution"); *id.*, at 727 ("[T]he

possible collateral consequences of making international rules privately actionable argue for judicial caution"). These concerns, which are implicated in any case arising under the ATS, are all the more pressing when the question is whether a cause of action under the ATS reaches conduct within the territory of another sovereign.

These concerns are not diminished by the fact that *Sosa* limited federal courts to recognizing causes of action only for alleged violations of international law norms that are "'specific, universal, and obligatory.'" *Id.,* at 732 (quoting *In re Estate of Marcos*, *Human Rights Litigation*, 25 F. 3d 1467, 1475 (CA9 1994)). As demonstrated by Congress's enactment of the Torture Victim Protection Act of 1991, 106 Stat. 73, note following 28 U. S. C. §1350, identifying such a norm is only the beginning of defining a cause of action. See *id.,* §3 (providing detailed definitions for extrajudicial killing and torture); *id.,* §2 (specifying who may be liable, creating a rule of exhaustion, and establishing a statute of limitations). Each of these decisions carries with it significant foreign policy implications.

The principles underlying the presumption against extraterritoriality thus constrain courts exercising their power under the ATS.

## III

Petitioners contend that even if the presumption applies, the text, history, and purposes of the ATS rebut it for causes of action brought under that statute. It is true that Congress, even in a jurisdictional provision, can indicate that it intends federal law to apply to conduct occurring abroad. See, *e.g.,* 18 U. S. C. §1091(e) (2006 ed., Supp. V) (providing jurisdiction over the offense of genocide "regardless of where the offense is committed" if the alleged offender is, among other things, "present in the United States"). But to rebut the presumption, the ATS would need to evince a "clear indication of extraterritorial-

ity." *Morrison*, 561 U. S., at \_\_\_ (slip op., at 16). It does
not.

To begin, nothing in the text of the statute suggests that
Congress intended causes of action recognized under it
to have extraterritorial reach. The ATS covers actions by
aliens for violations of the law of nations, but that does
not imply extraterritorial reach—such violations affect-
ing aliens can occur either within or outside the United
States. Nor does the fact that the text reaches "*any* civil
action" suggest application to torts committed abroad; it is
well established that generic terms like "any" or "every" do
not rebut the presumption against extraterritoriality. See,
*e.g.*, *id.*, at \_\_\_ (slip op., at 13–14); *Small* v. *United States*,
544 U. S. 385, 388 (2005); *Aramco*, 499 U. S., at 248–250;
*Foley Bros., Inc.* v. *Filardo*, 336 U. S. 281, 287 (1949).

Petitioners make much of the fact that the ATS provides
jurisdiction over civil actions for "torts" in violation of the
law of nations. They claim that in using that word, the
First Congress "necessarily meant to provide for jurisdic-
tion over extraterritorial transitory torts that could arise
on foreign soil." Supp. Brief for Petitioners 18. For sup-
port, they cite the common-law doctrine that allowed
courts to assume jurisdiction over such "transitory torts,"
including actions for personal injury, arising abroad. See
*Mostyn* v. *Fabrigas*, 1 Cowp. 161, 177, 98 Eng. Rep. 1021,
1030 (1774) (Mansfield, L.) ("[A]ll actions of a transitory
nature that arise abroad may be laid as happening in an
English county"); *Dennick* v. *Railroad Co.*, 103 U. S. 11, 18
(1881) ("Wherever, by either the common law or the stat-
ute law of a State, a right of action has become fixed and a
legal liability incurred, that liability may be enforced and
the right of action pursued in any court which has juris-
diction of such matters and can obtain jurisdiction of the
parties").

Under the transitory torts doctrine, however, "the only
justification for allowing a party to recover when the cause

of action arose in another civilized jurisdiction is a well founded belief that it was a cause of action in that place." *Cuba R. Co.* v. *Crosby*, 222 U. S. 473, 479 (1912) (majority opinion of Holmes, J.). The question under *Sosa* is not whether a federal court has jurisdiction to entertain a cause of action provided by foreign or even international law. The question is instead whether the court has authority to recognize a cause of action under U. S. law to enforce a norm of international law. The reference to "tort" does not demonstrate that the First Congress "necessarily meant" for those causes of action to reach conduct in the territory of a foreign sovereign. In the end, nothing in the text of the ATS evinces the requisite clear indication of extraterritoriality.

Nor does the historical background against which the ATS was enacted overcome the presumption against application to conduct in the territory of another sovereign. See *Morrison, supra,* at ___ (slip op., at 16) (noting that "[a]ssuredly context can be consulted" in determining whether a cause of action applies abroad). We explained in *Sosa* that when Congress passed the ATS, "three principal offenses against the law of nations" had been identified by Blackstone: violation of safe conducts, infringement of the rights of ambassadors, and piracy. 542 U. S., at 723, 724; see 4 W. Blackstone, Commentaries on the Laws of England 68 (1769). The first two offenses have no necessary extraterritorial application. Indeed, Blackstone— in describing them—did so in terms of conduct occurring within the forum nation. See *ibid.* (describing the right of safe conducts for those "who are here"); 1 *id.,* at 251 (1765) (explaining that safe conducts grant a member of one society "a right to intrude into another"); *id.,* at 245–248 (recognizing the king's power to "receiv[e] ambassadors at home" and detailing their rights in the state "wherein they are appointed to reside"); see also E. De Vattel, Law of Nations 465 (J. Chitty et al. transl. and ed.

1883) ("[O]n his entering the country to which he is sent, and making himself known, [the ambassador] is under the protection of the law of nations . . .").

Two notorious episodes involving violations of the law of nations occurred in the United States shortly before passage of the ATS. Each concerned the rights of ambassadors, and each involved conduct within the Union. In 1784, a French adventurer verbally and physically assaulted Francis Barbe Marbois—the Secretary of the French Legion—in Philadelphia. The assault led the French Minister Plenipotentiary to lodge a formal protest with the Continental Congress and threaten to leave the country unless an adequate remedy were provided. *Respublica* v. *De Longschamps*, 1 Dall. 111 (O. T. Phila. 1784); *Sosa*, *supra*, at 716–717, and n. 11. And in 1787, a New York constable entered the Dutch Ambassador's house and arrested one of his domestic servants. See Casto, The Federal Courts' Protective Jurisdiction over Torts Committed in Violation of the Law of Nations, 18 Conn. L. Rev. 467, 494 (1986). At the request of Secretary of Foreign Affairs John Jay, the Mayor of New York City arrested the constable in turn, but cautioned that because "'neither Congress nor our [State] Legislature have yet passed any act respecting a breach of the privileges of Ambassadors,'" the extent of any available relief would depend on the common law. See Bradley, The Alien Tort Statute and Article III, 42 Va. J. Int'l L. 587, 641–642 (2002) (quoting 3 Dept. of State, The Diplomatic Correspondence of the United States of America 447 (1837)). The two cases in which the ATS was invoked shortly after its passage also concerned conduct within the territory of the United States. See *Bolchos*, 3 F. Cas. 810 (wrongful seizure of slaves from a vessel while in port in the United States); *Moxon*, 17 F. Cas. 942 (wrongful seizure in United States territorial waters).

These prominent contemporary examples—immediately

before and after passage of the ATS—provide no support
for the proposition that Congress expected causes of action
to be brought under the statute for violations of the law of
nations occurring abroad.

The third example of a violation of the law of nations
familiar to the Congress that enacted the ATS was piracy.
Piracy typically occurs on the high seas, beyond the terri-
torial jurisdiction of the United States or any other coun-
try. See 4 Blackstone, *supra,* at 72 ("The offence of piracy,
by common law, consists of committing those acts of rob-
bery and depredation upon the high seas, which, if com-
mitted upon land, would have amounted to felony there").
This Court has generally treated the high seas the same
as foreign soil for purposes of the presumption against
extraterritorial application. See, *e.g., Sale* v. *Haitian
Centers Council, Inc.*, 509 U. S. 155, 173–174 (1993) (de-
clining to apply a provision of the Immigration and Na-
tionality Act to conduct occurring on the high seas); *Argen-
tine Republic* v. *Amerada Hess Shipping Corp.*, 488 U. S.
428, 440 (1989) (declining to apply a provision of the For-
eign Sovereign Immunities Act of 1976 to the high seas).
Petitioners contend that because Congress surely intended
the ATS to provide jurisdiction for actions against pirates,
it necessarily anticipated the statute would apply to con-
duct occurring abroad.

Applying U. S. law to pirates, however, does not typi-
cally impose the sovereign will of the United States onto
conduct occurring within the territorial jurisdiction of
another sovereign, and therefore carries less direct foreign
policy consequences. Pirates were fair game wherever
found, by any nation, because they generally did not oper-
ate within any jurisdiction. See 4 Blackstone, *supra,* at
71. We do not think that the existence of a cause of action
against them is a sufficient basis for concluding that other
causes of action under the ATS reach conduct that does
occur within the territory of another sovereign; pirates

may well be a category unto themselves. See *Morrison*, 561 U. S., at ___ (slip op., at 16) ("[W]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms"); see also *Microsoft Corp.*, 550 U. S., at 455–456.

Petitioners also point to a 1795 opinion authored by Attorney General William Bradford. See Breach of Neutrality, 1 Op. Atty. Gen. 57. In 1794, in the midst of war between France and Great Britain, and notwithstanding the American official policy of neutrality, several U. S. citizens joined a French privateer fleet and attacked and plundered the British colony of Sierra Leone. In response to a protest from the British Ambassador, Attorney General Bradford responded as follows:

> So far . . . as the transactions complained of originated or took place in a foreign country, they are not within the cognizance of our courts; nor can the actors be legally prosecuted or punished for them by the United States. But crimes committed on the high seas *are* within the jurisdiction of the . . . courts of the United States; and, so far as the offence was committed thereon, I am inclined to think that it may be legally prosecuted in . . . those courts . . . . But some doubt rests on this point, in consequence of the terms in which the [applicable criminal law] is expressed. But there can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a *civil* suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States . . . ." *Id.*, at 58–59.

Petitioners read the last sentence as confirming that "the Founding generation understood the ATS to apply to

law of nations violations committed on the territory of a foreign sovereign." Supp. Brief for Petitioners 33. Respondents counter that when Attorney General Bradford referred to "these acts of hostility," he meant the acts only insofar as they took place on the high seas, and even if his conclusion were broader, it was only because the applicable treaty had extraterritorial reach. See Supp. Brief for Respondents 28–30. The Solicitor General, having once read the opinion to stand for the proposition that an "ATS suit could be brought against American citizens for breaching neutrality with Britain only if acts did not take place in a foreign country," Supp. Brief for United States as *Amicus Curiae* 8, n. 1 (internal quotation marks and brackets omitted), now suggests the opinion "could have been meant to encompass . . . conduct [occurring within the foreign territory]," *id.*, at 8.

Attorney General Bradford's opinion defies a definitive reading and we need not adopt one here. Whatever its precise meaning, it deals with U. S. citizens who, by participating in an attack taking place both on the high seas and on a foreign shore, violated a treaty between the United States and Great Britain. The opinion hardly suffices to counter the weighty concerns underlying the presumption against extraterritoriality.

Finally, there is no indication that the ATS was passed to make the United States a uniquely hospitable forum for the enforcement of international norms. As Justice Story put it, "No nation has ever yet pretended to be the custos morum of the whole world . . . ." *United States* v. *The La Jeune Eugenie*, 26 F. Cas. 832, 847 (No. 15,551) (CC. Mass. 1822). It is implausible to suppose that the First Congress wanted their fledgling Republic—struggling to receive international recognition—to be the first. Indeed, the parties offer no evidence that any nation, meek or mighty, presumed to do such a thing.

The United States was, however, embarrassed by its

potential inability to provide judicial relief to foreign officials injured in the United States. Bradley, 42 Va. J. Int'l L., at 641. Such offenses against ambassadors violated the law of nations, "and if not adequately redressed could rise to an issue of war." *Sosa*, 542 U. S., at 715; cf. The Federalist No. 80, p. 536 (J. Cooke ed. 1961) (A. Hamilton) ("As the denial or perversion of justice . . . is with reason classed among the just causes of war, it will follow that the federal judiciary ought to have cognizance of all causes in which the citizens of other countries are concerned"). The ATS ensured that the United States could provide a forum for adjudicating such incidents. See *Sosa*, *supra*, at 715–718, and n. 11. Nothing about this historical context suggests that Congress also intended federal common law under the ATS to provide a cause of action for conduct occurring in the territory of another sovereign.

Indeed, far from avoiding diplomatic strife, providing such a cause of action could have generated it. Recent experience bears this out. See *Doe* v. *Exxon Mobil Corp.*, 654 F. 3d 11, 77–78 (CADC 2011) (Kavanaugh, J., dissenting in part) (listing recent objections to extraterritorial applications of the ATS by Canada, Germany, Indonesia, Papua New Guinea, South Africa, Switzerland, and the United Kingdom). Moreover, accepting petitioners' view would imply that other nations, also applying the law of nations, could hale our citizens into their courts for alleged violations of the law of nations occurring in the United States, or anywhere else in the world. The presumption against extraterritoriality guards against our courts triggering such serious foreign policy consequences, and instead defers such decisions, quite appropriately, to the political branches.

We therefore conclude that the presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption. "[T]here is no clear indication of extraterritoriality here,"

*Morrison*, 561 U. S., at ___ (slip op., at 16), and petitioners' case seeking relief for violations of the law of nations occurring outside the United States is barred.

## IV

On these facts, all the relevant conduct took place outside the United States. And even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application. See *Morrison*, 561 U. S. ___ (slip op. at 17–24). Corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices. If Congress were to determine otherwise, a statute more specific than the ATS would be required.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

—————

No. 10–1491

—————

ESTHER KIOBEL, INDIVIDUALLY AND ON BEHALF OF HER
LATE HUSBAND, DR. BARINEM KIOBEL, ET AL., PETI-
TIONERS *v.* ROYAL DUTCH PETROLEUM CO. ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 17, 2013]

JUSTICE KENNEDY, concurring.

The opinion for the Court is careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute. In my view that is a proper disposition. Many serious concerns with respect to human rights abuses committed abroad have been addressed by Congress in statutes such as the Torture Victim Protection Act of 1991 (TVPA), 106 Stat. 73, note following 28 U. S. C. §1350, and that class of cases will be determined in the future according to the detailed statutory scheme Congress has enacted. Other cases may arise with allegations of serious violations of international law principles protecting persons, cases covered neither by the TVPA nor by the reasoning and holding of today's case; and in those disputes the proper implementation of the presumption against extraterritorial application may require some further elaboration and explanation.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–1491

_____

ESTHER KIOBEL, INDIVIDUALLY AND ON BEHALF OF HER
LATE HUSBAND, DR. BARINEM KIOBEL, ET AL., PETI-
TIONERS *v.* ROYAL DUTCH PETROLEUM CO. ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 17, 2013]

JUSTICE ALITO, with whom JUSTICE THOMAS joins,
concurring.

I concur in the judgment and join the opinion of the
Court as far as it goes. Specifically, I agree that when
Alien Tort Statute (ATS) "claims touch and concern the
territory of the United States, they must do so with suffi-
cient force to displace the presumption against extraterri-
torial application." *Ante*, at 14. This formulation obviously
leaves much unanswered, and perhaps there is wisdom
in the Court's preference for this narrow approach. I write
separately to set out the broader standard that leads me
to the conclusion that this case falls within the scope of
the presumption.

In *Morrison* v. *National Australia Bank Ltd.*, 561 U. S.
\_\_\_ (2010), we explained that "the presumption against
extraterritorial application would be a craven watchdog
indeed if it retreated to its kennel whenever *some* domes-
tic activity is involved in the case." *Id.,* at \_\_\_ (slip op., at
17). We also reiterated that a cause of action falls out-
side the scope of the presumption—and thus is not barred
by the presumption—only if the event or relationship that
was "the 'focus' of congressional concern" under the rele-
vant statute takes place within the United States. *Ibid.*
(quoting *EEOC* v. *Arabian American Oil Co.*, 499 U. S.

244, 255 (1991)). For example, because "the focus of the [Securities] Exchange Act [of 1934] is not upon the place where the deception originated, but upon purchases and sales of securities in the United States," we held in *Morrison* that §10(b) of the Exchange Act applies "only" to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." 561 U. S., at ___–___ (slip op., at 17–18).

The Court's decision in *Sosa* v. *Alvarez-Machain,* 542 U. S. 692 (2004), makes clear that when the ATS was enacted, "congressional concern" was "'focus[ed],'" *Morrison, supra*, at ___ (slip op., at 17), on the "three principal offenses against the law of nations" that had been identified by Blackstone: violation of safe conducts, infringement of the rights of ambassadors, and piracy, *Sosa*, 542 U. S., at 723–724. The Court therefore held that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when [the ATS] was enacted." *Id.,* at 732. In other words, only conduct that satisfies *Sosa*'s requirements of definiteness and acceptance among civilized nations can be said to have been "the 'focus' of congressional concern," *Morrison, supra*, at ___ (slip op., at 17), when Congress enacted the ATS. As a result, a putative ATS cause of action will fall within the scope of the presumption against extraterritoriality—and will therefore be barred—unless the domestic conduct is sufficient to violate an international law norm that satisfies *Sosa*'s requirements of definiteness and acceptance among civilized nations.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–1491

_____

ESTHER KIOBEL, INDIVIDUALLY AND ON BEHALF OF HER
LATE HUSBAND, DR. BARINEM KIOBEL, ET AL., PETI-
TIONERS *v.* ROYAL DUTCH PETROLEUM CO. ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 17, 2013]

JUSTICE BREYER, with whom JUSTICE GINSBURG,
JUSTICE SOTOMAYOR and JUSTICE KAGAN join, concurring
in the judgment.

I agree with the Court's conclusion but not with its
reasoning. The Court sets forth four key propositions of
law: First, the "presumption against extraterritoriality
applies to claims under" the Alien Tort Statute. *Ante,* at
13. Second, "nothing in the statute rebuts that presump-
tion." *Ibid.* Third, there "is no clear indication of extra-
territoria[l application] here," where "all the relevant
conduct took place outside the United States" and "where
the claims" do not "touch and concern the territory of the
United States . . . with sufficient force to displace the
presumption." *Ante,* at 13–14 (internal quotation marks
omitted). Fourth, that is in part because "[c]orporations
are often present in many countries, and it would reach
too far to say that mere corporate presence suffices." *Ante,*
at 14.

Unlike the Court, I would not invoke the presumption
against extraterritoriality. Rather, guided in part by
principles and practices of foreign relations law, I would
find jurisdiction under this statute where (1) the alleged
tort occurs on American soil, (2) the defendant is an Amer-
ican national, or (3) the defendant's conduct substantially

and adversely affects an important American national interest, and that includes a distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind. See *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 732 (2004) ("'[F]or purposes of civil liability, the torturer has become—like the pirate and slave trader before him—*hostis humani generis*, an enemy of all mankind.'" (quoting *Filartiga* v. *Pena-Irala*, 630 F. 2d 876, 890 (CA2 1980) (alteration in original))). See also 1 Restatement (Third) of Foreign Relations Law of the United States §§ 402, 403, 404 (1986). In this case, however, the parties and relevant conduct lack sufficient ties to the United States for the ATS to provide jurisdiction.

I

A

Our decision in *Sosa* frames the question. In *Sosa* the Court specified that the Alien Tort Statute (ATS), when enacted in 1789, "was intended as jurisdictional." 542 U. S., at 714. We added that the statute gives today's courts the power to apply certain "judge-made" damages law to victims of certain foreign affairs-related misconduct, including "three specific offenses" to which "Blackstone referred," namely "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.,* at 715. We held that the statute provides today's federal judges with the power to fashion "a cause of action" for a "modest number" of claims, "based on the present-day law of nations," and which "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features" of those three "18th-century paradigms." *Id.,* at 724–725.

We further said that, in doing so, a requirement of "exhaust[ion]" of "remedies" might apply. *Id.,* at 733, n. 21. We noted "a strong argument that federal courts

should give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Ibid.* Adjudicating any such claim must, in my view, also be consistent with those notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its own laws and their enforcement. *Id.,* at 761 (BREYER, J., concurring in part and concurring in judgment). See also *F. Hoffmann-La Roche Ltd* v. *Empagran S. A.*, 542 U. S. 155, 165–169 (2004).

Recognizing that Congress enacted the ATS to permit recovery of damages from pirates and others who violated basic international law norms as understood in 1789, *Sosa* essentially leads today's judges to ask: Who are today's pirates? See 542 U. S., at 724–725 (majority opinion). We provided a framework for answering that question by setting down principles drawn from international norms and designed to limit ATS claims to those that are similar in character and specificity to piracy. *Id.,* at 725.

In this case we must decide the extent to which this jurisdictional statute opens a federal court's doors to those harmed by activities belonging to the limited class that *Sosa* set forth *when those activities take place abroad.* To help answer this question here, I would refer both to *Sosa* and, as in *Sosa,* to norms of international law. See Part II, *infra.*

B

In my view the majority's effort to answer the question by referring to the "presumption against extraterritoriality" does not work well. That presumption "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 5–6). See *ante,* at 4. The ATS, however, was enacted with "foreign matters" in mind. The statute's text refers explicitly to "alien[s]," "treat[ies]," and "the law of nations." 28

U. S. C. §1350. The statute's purpose was to address "violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs." *Sosa*, 542 U. S., at 715. And at least one of the three kinds of activities that we found to fall within the statute's scope, namely piracy, *ibid.,* normally takes place abroad. See 4 W. Blackstone, Commentaries on the Law of England 72 (1769).

The majority cannot wish this piracy example away by emphasizing that piracy takes place on the high seas. See *ante,* at 10. That is because the robbery and murder that make up piracy do not normally take place in the water; they take place on a ship. And a ship is like land, in that it falls within the jurisdiction of the nation whose flag it flies. See *McCulloch* v. *Sociedad Nacional de Marineros de Honduras*, 372 U. S. 10, 20–21 (1963); 2 Restatement §502, Comment *d* ("[F]lag state has jurisdiction to prescribe with respect to any activity aboard the ship"). Indeed, in the early 19th century Chief Justice Marshall described piracy as an "offenc[e] against the nation under whose flag the vessel sails, and within whose particular jurisdiction all on board the vessel are." *United States* v. *Palmer*, 3 Wheat. 610, 632 (1818). See *United States* v. *Furlong*, 5 Wheat. 184, 197 (1820) (a crime committed "within the jurisdiction" of a foreign state and a crime committed "in the vessel of another nation" are "the same thing").

The majority nonetheless tries to find a distinction between piracy at sea and similar cases on land. It writes, "Applying U. S. law to pirates . . . does not typically impose the sovereign will of the United States onto conduct occurring within the *territorial* jurisdiction of another sovereign and therefore carries less direct foreign policy consequences." *Ante,* at 10 (emphasis added). But, as I have just pointed out, "[a]pplying U. S. law to pirates" *does* typically involve applying our law to acts taking place

within the jurisdiction of another sovereign. Nor can the majority's words "territorial jurisdiction" sensibly distinguish land from sea for purposes of isolating adverse foreign policy risks, as the Barbary Pirates, the War of 1812, the sinking of the *Lusitania,* and the Lockerbie bombing make all too clear.

The majority also writes, "Pirates were fair game wherever found, by any nation, because they generally did not operate within any jurisdiction." *Ibid.* I very much agree that pirates were fair game "wherever found." Indeed, that is the point. That is why we asked, in *Sosa,* who are today's pirates? Certainly today's pirates include torturers and perpetrators of genocide. And today, like the pirates of old, they are "fair game" where they are found. Like those pirates, they are "common enemies of all mankind and all nations have an equal interest in their apprehension and punishment." 1 Restatement §404 Reporters' Note 1, p. 256 (quoting *In re Demjanjuk*, 612 F. Supp. 544, 556 (ND Ohio 1985) (internal quotation marks omitted)). See *Sosa, supra,* at 732. And just as a nation that harbored pirates provoked the concern of other nations in past centuries, see *infra,* at 8, so harboring "common enemies of all mankind" provokes similar concerns today.

Thus the Court's reasoning, as applied to the narrow class of cases that *Sosa* described, fails to provide significant support for the use of any presumption against extraterritoriality; rather, it suggests the contrary. See also *ante,* at 10 (conceding and citing cases showing that this Court has "generally treated the high seas the same as foreign soil for purposes of the presumption against extraterritorial application").

In any event, as the Court uses its "presumption against extraterritorial application," it offers only limited help in deciding the question presented, namely "'under what circumstances the Alien Tort Statute . . . allows courts to recognize a cause of action for violations of the law of

nations occurring within the territory of a sovereign other than the United States.'"  565 U. S. ___ (2012).  The majority echoes in this jurisdictional context *Sosa*'s warning to use "caution" in shaping federal common-law causes of action.  *Ante,* at 5.  But it also makes clear that a statutory claim might sometimes "touch and concern the territory of the United States . . . with sufficient force to displace the presumption."  *Ante,* at 14.  It leaves for another day the determination of just when the presumption against extraterritoriality might be "overcome."  *Ante,* at 8.

## II

In applying the ATS to acts "occurring within the territory of a[nother] sovereign," I would assume that Congress intended the statute's jurisdictional reach to match the statute's underlying substantive grasp.  That grasp, defined by the statute's purposes set forth in *Sosa,* includes compensation for those injured by piracy and its modern-day equivalents, at least where allowing such compensation avoids "serious" negative international "consequences" for the United States.  542 U. S., at 715.  And just as we have looked to established international substantive norms to help determine the statute's substantive reach, *id.,* at 729*,* so we should look to international jurisdictional norms to help determine the statute's jurisdictional scope.

The Restatement (Third) of Foreign Relations Law is helpful.  Section 402 recognizes that, subject to §403's "reasonableness" requirement, a nation may apply its law (for example, federal common law, see 542 U. S., at 729–730) not only (1) to "conduct" that "takes place [or to persons or things] within its territory" but also (2) to the "activities, interests, status, or relations of its nationals outside as well as within its territory," (3) to "conduct outside its territory that has or is intended to have substantial effect within its territory," and (4) to certain

foreign "conduct outside its territory . . . that is directed against the security of the state or against a limited class of other state interests." In addition, §404 of the Restatement explains that a "state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade," and analogous behavior.

Considering these jurisdictional norms in light of both the ATS's basic purpose (to provide compensation for those injured by today's pirates) and *Sosa*'s basic caution (to avoid international friction), I believe that the statute provides jurisdiction where (1) the alleged tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's conduct substantially and adversely affects an important American national interest, and that includes a distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind.

I would interpret the statute as providing jurisdiction only where distinct American interests are at issue. Doing so reflects the fact that Congress adopted the present statute at a time when, as Justice Story put it, "No nation ha[d] ever yet pretended to be the custos morum of the whole world." *United States* v. *La Jeune Eugenie*, 26 F. Cas. 832, 847 (No. 15,551) (CC Mass. 1822). That restriction also should help to minimize international friction. Further limiting principles such as exhaustion, *forum non conveniens*, and comity would do the same. So would a practice of courts giving weight to the views of the Executive Branch. See *Sosa*, 542 U. S., at 733, n. 21; *id.,* at 761 (opinion of BREYER, J.).

As I have indicated, we should treat this Nation's interest in not becoming a safe harbor for violators of the most fundamental international norms as an important jurisdiction-related interest justifying application of the ATS in light of

the statute's basic purposes—in particular that of compensating those who have suffered harm at the hands of, *e.g.,* torturers or other modern pirates. Nothing in the statute or its history suggests that our courts should turn a blind eye to the plight of victims in that "handful of heinous actions." *Tel-Oren* v. *Libyan Arab Republic*, 726 F. 2d 774, 781 (CADC 1984) (Edwards, J., concurring). See generally Leval, The Long Arm of International Law: Giving Victims of Human Rights Abuses Their Day in Court, 92 Foreign Affairs 16 (Mar. / Apr. 2013). To the contrary, the statute's language, history, and purposes suggest that the statute was to be a weapon in the "war" against those modern pirates who, by their conduct, have "declar[ed] war against all mankind." 4 Blackstone 71.

International norms have long included a duty not to permit a nation to become a safe harbor for pirates (or their equivalent). See generally A. Bradford, Flying the Black Flag: A Brief History of Piracy 19 (2007) ("Every polis by the sea . . . which was suspected of sponsoring piracy or harboring pirates could be attacked and destroyed by the Athenians"); F. Sanborn, Origins of the Early English Maritime and Commercial Law 313 (1930) ("In 1490 Henry VII made a proclamation against harboring pirates or purchasing goods from them"); N. Risjord, Representative Americans: The Colonists 146 (1981) ("William Markham, Penn's lieutenant governor in the 1690s, was accused of harboring pirates in Philadelphia . . . . Governor Benjamin Fletcher of New York became the target of a royal inquiry after he issued privateering commissions to a band of notorious pirates"); 3 C. Yonge, A Pictorial History of the World's Great Nations 954 (1882) ("[In the early 18th century, t]he government of Connecticut was accused of harboring pirates"); S. Menefee, Piracy, Terrorism, and the Insurgent Passenger: A Historical and Legal Perspective, in Maritime Terrorism and International Law 51 (N. Ronzitti ed. 1990) (quoting the judge

who handled the seizure of the *Chesapeake* during the Civil War as stating that "'piracy *jure gentium* was justiciable by the court of New Brunswick, wherever committed'"); D. Field, Outlines of an International Code 33, Art. 84 (2d ed. 1876) (citing the 1794 treaty between the United States and Great Britain ("*Harboring pirates forbidden.* No nation can receive pirates into its territory, or permit any person within the same to receive, protect, conceal or assist them in any manner; but must punish all persons guilty of such acts")).

More recently two lower American courts have, in effect, rested jurisdiction primarily upon that kind of concern. In *Filartiga*, 630 F. 2d 876, an alien plaintiff brought a lawsuit against an alien defendant for damages suffered through acts of torture that the defendant allegedly inflicted in a foreign nation, Paraguay. Neither plaintiff nor defendant was an American national and the actions underlying the lawsuit took place abroad. The defendant, however, "had . . . resided in the United States for more than ninth months" before being sued, having overstayed his visitor's visa. *Id.,* at 878–879. Jurisdiction was deemed proper because the defendant's alleged conduct violated a well-established international law norm, and the suit vindicated our Nation's interest in not providing a safe harbor, free of damages claims, for those defendants who commit such conduct.

In *Marcos*, the plaintiffs were nationals of the Philippines, the defendant was a Philippine national, and the alleged wrongful act, death by torture, took place abroad. *In re Estate of Marcos, Human Rights Litigation*, 25 F. 3d 1467, 1469, 1475 (CA9 1994); *In re Estate of Marcos Human Rights Litigation*, 978 F. 2d 493, 495–496, 500 (CA9 1992). A month before being sued, the defendant, "his family, . . . and others loyal to [him] fled to Hawaii," where the ATS case was heard. *Marcos*, 25 F. 3d, at 1469. As in *Filartiga*, the court found ATS jurisdiction.

And in *Sosa* we referred to both cases with approval, suggesting that the ATS allowed a claim for relief in such circumstances. 542 U. S., at 732. See also *Flomo* v. *Firestone Natural Rubber Co.*, 643 F. 3d 1013, 1025 (CA7 2011) (Posner, J.) ("*Sosa* was a case of nonmaritime extraterritorial conduct yet no Justice suggested that therefore it couldn't be maintained"). Not surprisingly, both before and after *Sosa*, courts have consistently rejected the notion that the ATS is categorically barred from extraterritorial application. See, *e.g.,* 643 F. 3d, at 1025 ("[N]o court to our knowledge has ever held that it doesn't apply extraterritorially"); *Sarei* v. *Rio Tinto, PLC*, 671 F. 3d 736, 747 (CA9 2011) (en banc) ("We therefore conclude that the ATS is not limited to conduct occurring within the United States"); *Doe* v. *Exxon Mobil Corp.*, 654 F. 3d 11, 20 (CADC 2011) ("[W]e hold that there is no extraterritoriality bar").

Application of the statute in the way I have suggested is consistent with international law and foreign practice. Nations have long been obliged not to provide safe harbors for their own nationals who commit such serious crimes abroad. See E. de Vattel, Law of Nations, Book II, p. 163 (§76) ("pretty generally observed" practice in "respect to great crimes, which are equally contrary to the laws and safety of all nations," that a sovereign should not "suffer his subjects to molest the subjects of other states, or to do them an injury," but should "compel the transgressor to make reparation for the damage or injury," or be "deliver[ed] . . . up to the offended state, to be there brought to justice").

Many countries permit foreign plaintiffs to bring suits against their own nationals based on unlawful conduct that took place abroad. See, *e.g.,* Brief for Government of the Kingdom of the Netherlands et al. as *Amici Curiae* 19–23 (hereinafter Netherlands Brief) (citing *inter alia Guerrero* v. *Monterrico Metals PLc* [2009] EWHC (QB) 2475

(Eng.) (attacking conduct of U. K. companies in Peru); *Lubbe and Others* v. *Cape PLc* [2000] UKHL 41 (attacking conduct of U. K. companies in South Africa); *Rb. Gravenhage* [Court of the Hague], 30 December 2009, JOR 2010, 41 m.nt. Mr. RGJ de Haan (Oguro/Royal Dutch Shell PLC) (Neth.) (attacking conduct of Dutch respondent in Nigeria)). See also Brief for European Commission as *Amicus Curiae* 11 (It is "uncontroversial" that the "United States may . . . exercise jurisdiction over ATS claims involving conduct committed by its own nationals within the territory of another sovereign, consistent with international law").

Other countries permit some form of lawsuit brought by a foreign national against a foreign national, based upon conduct taking place abroad and seeking damages. Certain countries, which find "universal" criminal "jurisdiction" to try perpetrators of particularly heinous crimes such as piracy and genocide, see Restatement §404, also permit private persons injured by that conduct to pursue *"actions civiles,"* seeking civil damages in the criminal proceeding. Thompson, Ramasastry, & Taylor, Translating *Unocal*: The Expanding Web of Liability for Business Entities Implicated in International Crimes, 40 Geo. Wash. Int'l L. Rev. 841, 886 (2009). See, *e.g., Ely Ould Dah* v. *France*, App. No. 13113/03 (Eur. Ct. H. R.; Mar 30, 2009), 48 Int'l Legal Materials 884; Metcalf, Reparations for Displaced Torture Victims, 19 Cardozo J. Int'l & Comp. L. 451, 468–470 (2011). Moreover, the United Kingdom and the Netherlands, while not authorizing such damages actions themselves, tell us that they would have no objection to the exercise of American jurisdiction in cases such as *Filartiga* and *Marcos*. Netherlands Brief 15–16, and n. 23.

At the same time Congress has ratified treaties obliging the United States to find and punish foreign perpetrators of serious crimes committed against foreign persons

abroad. See Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents, Dec. 28, 1973, 28 U. S. T. 1975, T. I. A. S. No. 8532; Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, Sept. 23, 1971, 24 U. S. T. 565, T. I. A. S. No. 7570; Convention for the Suppression of Unlawful Seizure of Aircraft, Dec. 16, 1970, 22 U. S. T. 1641, T. I. A. S. No. 7192; Restatement §404 Reporters' Note 1, at 257 ("These agreements include an obligation on the parties to punish or extradite offenders, even when the offense was not committed within their territory or by a national"). See also International Convention for the Protection of All Persons from Enforced Disappearance, Art. 9(2) (2006) (state parties must take measures to establish jurisdiction "when the alleged offender is present in any territory under its jurisdiction, unless it extradites or surrenders him or her"); http://www.unhcr.org/refworld/docid/47fdfaeb0.pdf (as visited Apr.1, 2013, and available in Clerk of Court's case file); Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment, Dec. 10, 1984, 1465 U. N. T. S. 85, Arts. 5(2), 7(1) (similar); Geneva Convention (III) Relative to the Treatment of Prisoners of War, Art. 129, Aug. 12, 1949, [1955] 6 U. S. T. 3316, T. I. A. S. No. 3364 (signatories must "search for persons alleged to have committed, or to have ordered to be committed, such grave breaches, and shall bring such persons, regardless of their nationality, before its own courts" or "hand such persons over for trial").

And Congress has sometimes authorized civil damages in such cases. See generally note following 28 U. S. C. §1350 (Torture Victim Protection Act of 1991 (TVPA) (private damages action for torture or extrajudicial killing committed under authority of a foreign nation)); S. Rep. No. 102–249, p. 4 (1991) (ATS "should not be replaced" by TVPA); H. R. Rep. No. 102–367, pt. 1, p. 4 (TVPA intended

to "enhance the remedy already available under" the ATS). But cf. *Mohamad* v. *Palestinian Authority*, 566 U. S. ___ (2012) (TVPA allows suits against only natural persons).

Congress, while aware of the award of civil damages under the ATS—including cases such as *Filartiga* with foreign plaintiffs, defendants, and conduct—has not sought to limit the statute's jurisdictional or substantive reach. Rather, Congress has enacted other statutes, and not only criminal statutes, that allow the United States to prosecute (or allow victims to obtain damages from) foreign persons who injure foreign victims by committing abroad torture, genocide, and other heinous acts. See, *e.g.*, 18 U. S. C. §2340A(b)(2) (authorizing prosecution of torturers if "the alleged offender is present in the United States, irrespective of the nationality of the victim or alleged offender"); §1091(e)(2)(D) (2006 ed., Supp. V) (genocide prosecution authorized when, "regardless of where the offense is committed, the alleged offender is . . . present in the United States"); note following 28 U. S. C. §1350, §2(a) (private right of action on behalf of individuals harmed by an act of torture or extrajudicial killing committed "under actual or apparent authority, or color of law, of any foreign nation"). See also S. Rep. No. 102–249, *supra*, at 3–4 (purpose to "mak[e] sure that torturers and death squads will no longer have a safe haven in the United States," by "providing a civil cause of action in U. S. courts for torture committed abroad").

Thus, the jurisdictional approach that I would use is analogous to, and consistent with, the approaches of a number of other nations. It is consistent with the approaches set forth in the Restatement. Its insistence upon the presence of some distinct American interest, its reliance upon courts also invoking other related doctrines such as comity, exhaustion, and *forum non conveniens*, along with its dependence (for its workability) upon courts obtaining, and paying particular attention to, the views of

the Executive Branch, all should obviate the majority's concern that our jurisdictional example would lead "other nations, also applying the law of nations," to "hale our citizens into their courts for alleged violations of the law of nations occurring in the United States, or anywhere else in the world." *Ante,* at 13.

Most importantly, this jurisdictional view is consistent with the substantive view of the statute that we took in *Sosa.* This approach would avoid placing the statute's jurisdictional scope at odds with its substantive objectives, holding out "the word of promise" of compensation for victims of the torturer, while "break[ing] it to the hope."

## III

Applying these jurisdictional principles to this case, however, I agree with the Court that jurisdiction does not lie. The defendants are two foreign corporations. Their shares, like those of many foreign corporations, are traded on the New York Stock Exchange. Their only presence in the United States consists of an office in New York City (actually owned by a separate but affiliated company) that helps to explain their business to potential investors. See Supp. Brief for Petitioners 4, n. 3 (citing *Wiwa* v. *Royal Dutch Petroleum Co.*, 226 F. 3d 88, 94 (CA2 2000)); App. 55. The plaintiffs are not United States nationals but nationals of other nations. The conduct at issue took place abroad. And the plaintiffs allege, not that the defendants directly engaged in acts of torture, genocide, or the equivalent, but that they helped others (who are not American nationals) to do so.

Under these circumstances, even if the New York office were a sufficient basis for asserting general jurisdiction, but see *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. ___ (2011), it would be farfetched to believe, based solely upon the defendants' minimal and indirect American presence, that this legal action helps to vindi-

cate a distinct American interest, such as in not providing a safe harbor for an "enemy of all mankind."  Thus I agree with the Court that here it would "reach too far to say" that such "mere corporate presence suffices."  *Ante*, at 14.

I consequently join the Court's judgment but not its opinion.